985 F.2d 559
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Ada M. FISHER, Plaintiff-Appellant,
v.
Daniel CONRAD and Martin Marietta Energy Systems, Inc.
Defendants-Appellees.
 No. 92-5297.
 United States Court of Appeals, Sixth Circuit.
 Jan. 29, 1993.
 
 Before BOYCE F. MARTIN, JR., MILBURN and ALAN E. NORRIS, Circuit Judges.
 PER CURIAM.
 
 
 1
 Plaintiff Dr. Ada Fisher, M.D., appeals the district court's judgment in favor of defendants Martin Marietta Energy Systems, Inc. ("Martin Marietta") and Daniel Conrad, as the result of a bench trial, in this action alleging violations of the Equal Pay Act, 29 U.S.C. § 206(d), and the Tennessee Human Rights Act ("THRA"), Tennessee Code Annotated § 4-21-101 et seq. On appeal, the issues are (1) whether the district court properly found that defendant Martin Marietta complied with the Equal Pay Act, 29 U.S.C. § 206(d), in that the wages of physicians employed by defendant, including plaintiff, were based on factors other than sex, including a bona fide merit system; (2) whether the district court erred in failing to find discrimination in violation of the THRA in defendants' failure to promote, in failing to find that defendants' made their selection for the Y-12 Medical Director position based upon considerations of race and sex in violation of state law; (3) whether the district court erred in failing to find that defendants constructively discharged plaintiff in violation of the THRA; and (4) whether the district court erred in determining that defendants did not permit or create a hostile work environment arising from race and sex based harassment in violation of the THRA. For the reasons that follow, we affirm.
 
 I.
 A.
 
 2
 Plaintiff Dr. Ada M. Fisher is a black female physician. She received her medical degree from the University of Wisconsin in May 1975, and, thereafter, completed her residency in family medicine at the University of Rochester. She is board certified in family medicine, and board eligible in the field of occupational medicine. Plaintiff was licensed to practice medicine in North Carolina, Maryland, and New York. Plaintiff also received a master's degree in public health, with emphasis on health services administration, from Johns Hopkins University.
 
 
 3
 In January 1985, plaintiff was hired as a staff physician for defendant Martin Marietta Energy Systems, Inc ("Martin Marietta"). Martin Marietta manages and operates five facilities in three states under a contract with the United States Department of Energy ("DOE"). Three of the facilities are located in Oak Ridge, Tennessee, including the Y-12 plant, the Oak Ridge National Laboratory, and the K-25 plant. Each facility has a Health Center staffed by physicians under the direction of a medical director. Prior to June 1986, the medical director of each facility reported to the facility official in charge of personnel. Dr. Daniel E. Conrad, M.D., was appointed corporate medical director in June 1986. From that time forward, the medical director of each facility reported to Dr. Conrad.
 
 
 4
 In 1984, Martin Marietta sought to fill a staff physician position at the Y-12 Health Center. Plaintiff was interviewed for the position on September 5, 1984, by Dr. Gino Zanolli, Y-12 Medical Director; Dr. James White, Y-12 Director of Personnel; and Gordon Fee, Y-12 Plant Manager. On October 19, 1984, Martin Marietta offered the Y-12 staff position to plaintiff at a starting salary of $5,000 per month or $60,000 per year. That offer was the most that Martin Marietta had paid a starting staff physician up to that time and was equal to the pay offered to a white male physician hired in December 1984.
 
 
 5
 Prior to moving to Oak Ridge, plaintiff was employed as Director of the Alcohol Detoxification Unit at John Umstead Hospital in Butner, North Carolina. She was also in charge of employee health occupational medicine at John Umstead Hospital. Prior to working at John Umstead Hospital, plaintiff was the Employee Health Physician for approximately two hundred to four hundred hospital employees at Highland Hospital in Rochester, New York. She also worked as Chief Medical Officer and Medical Director at the United States Public Health Service in Greenevers, North Carolina, for more than two years. Part of plaintiff's work for the U.S. Public Health Service involved supervision and policy making.
 
 
 6
 Plaintiff moved to Oak Ridge, Tennessee, expecting to begin work for Martin Marietta on January 28, 1985. However, on January 10, 1985, she learned that she would not be placed on Martin Marietta's payroll until such time as she was licensed to practice medicine in Tennessee. Plaintiff testified that she had not been informed that she could not report to work until she acquired her state medical license and that it was common practice for a company physician to be placed on the payroll while awaiting her license, which is what she thought would happen in her situation. Plaintiff alleges that another physician who, like herself, had been hired at the Y-12 plant was allowed to start work and was paid by Martin Marietta before obtaining his Tennessee license. Plaintiff was not placed on the Martin Marietta payroll until March 25, 1985.
 
 
 7
 Plaintiff was unable to meet the requirements for her Tennessee license in January 1985, because one of her scores on the flex (federal licensing) exam failed to meet the Tennessee requirements. Martin Marietta assisted plaintiff in obtaining her license, however, by transporting her to Nashville for a required interview and providing her with a temporary allowance of $1,500 for living expenses until she could obtain her license.
 
 
 8
 Dr. Gino Zanolli, the Medical Director for the Martin Marietta Y-12 plant, was plaintiff's direct supervisor when she began work in 1985. Subsequent to her acceptance of the employment offer from Martin Marietta, plaintiff learned that Dr. Zanolli opposed the offer of employment made to her. Plaintiff alleges that the primary reason for Dr. Zanolli's opposition was his personal dislike for plaintiff, resulting from his interview with her, and his belief that as a black female she would be unable to establish a rapport with the blue collar workers at the Y-12 plant. During his tenure as Medical Director of the Y-12 plant, Dr. Zanolli had not previously hired either a black or female physician.
 
 
 9
 During the first few weeks of her employment, Dr. Zanolli assigned the responsibility of supervising the clerical and secretarial staff at the Y-12 Medical Center to plaintiff. Previously, Dr. Zanolli had performed that function. Plaintiff immediately made changes in how the work was to be performed. She redistributed the work load at the front desk because she believed a disproportionate share of it was being performed by four persons, three of whom were black. The clerical personnel were unhappy both about the changes and the manner in which they were implemented. This resulted in an overwhelming number of complaints from the clerical employees. Ultimately, Dr. Zanolli removed plaintiff as supervisor of the clerical employees on February 3, 1986. She was replaced by Marcia Chandler, a black female clerical employee.
 
 
 10
 Plaintiff's treatment of employees also resulted in a number of complaints. She testified to at least four meetings she had with upper levels of management over complaints about her treatment of patients. One complaint to DOE triggered an independent investigation by an outside consultant, Roy L. DeHart, M.D.
 
 
 11
 The employee/patient complained that plaintiff had misdiagnosed a serious ear infection, appeared rushed, was not attentive to his problem, and treated him as "less than a human being." After conducting his investigation, Dr. DeHart reported: (1) plaintiff possibly made a misdiagnosis; (2) plaintiff paid inadequate attention to patient/physician relationships; (3) plaintiff's interpersonal skills were deficient; and (4) plaintiff and Dr. Zanolli had a major interpersonal conflict.
 
 
 12
 On February 28, 1986, Dr. Zanolli evaluated plaintiff's job performance for the period from March 1985 through February 1986. He rated plaintiff's performance as unacceptable, the lowest of the seven ratings used by Martin Marietta, stating:
 
 
 13
 Has the professional tools-but not used effectively. Too many examples of not looking at a problem thoroughly before making a referral or appropriate disposition. Strong tendencies toward often grandiose diagnoses and excessive referrals--but biggest problem is interpersonal relationships--Never in my experience has there been such an avalanche of protests--primarily in the way they have been talked (down) to/and or handled--Any effectiveness is more than compromised--Overall have to rate as unacceptable--badly needing improvement.
 
 
 14
 J.A. p. 209.
 
 
 15
 Plaintiff disagreed with the evaluation and wrote to Dr. Zanolli stating that it was unfair and inaccurate. She also wrote to Gordon Fee, Y-12 Plant Manager. Fee noted that under company policy, plaintiff could not receive a salary increase as long as her performance appraisal was "unsatisfactory." Fee requested that Zanolli meet periodically with plaintiff to review her performance and establish targets for improvement.
 
 
 16
 On June 4, 1986, Dr. Zanolli reported to Harry Conner, Y-12 Director of Personnel, that he remained concerned about plaintiff's performance. He noted that she had improved her daily demeanor but continued to go her own way and generate complaints. He referred to her as "a sub-par clinician" with an "I know it all" attitude who continued to "treat people poorly." J.A. p. 223.
 
 
 17
 In June 1986, defendant Dr. Daniel Conrad was hired by Martin Marietta as corporate medical director. Dr. Conrad reported to Harry Conner. Conner and Dr. Zanolli met with plaintiff on July 14, 1986, to discuss her performance since the February appraisal as well as targets for improvement. Conner informed plaintiff that under company policy she could not receive a salary increase while an unsatisfactory rating was in place. Dr. Zanolli reviewed the benchmarks with plaintiff, informing her that she had improved in diagnostic skills but that there was still evidence of poor diagnoses and judgment. Dr. Zanolli noted that plaintiff had reduced her referral rate, improved her interactions with staff, and generated fewer complaints. Dr. Zanolli informed plaintiff that her performance merited a "3-" rating, which meant "acceptable minus."
 
 
 18
 On July 25, 1986, plaintiff sent a letter to Conner, alleging that the February 1986 performance appraisal was "patently biased." She also referred to "racism, lack of formal direction, and oppressive conditions under which I have been forced to work...." She stated, "I regret that nothing in my meeting with you ... and my interactions with Dr. Zanolli has shown me that I can get a fair review of my performance from my supervision as structured." J.A. pp. 242-43.
 
 
 19
 On August 14, 1986, plaintiff met with Dr. Zanolli in a second performance review meeting. At that meeting, Zanolli complimented plaintiff for continuing to show improvement in her work and informed her that he would rate her performance as "acceptable." Dr. Zanolli also expressed concern that plaintiff had not given him a copy of her letter to Conner accusing him of racist and sexist attitudes. In a memo to the file, Zanolli expressed amazement at plaintiff's allegations toward him, stating "this is one of the lowest [of blows] not only to me personally, but to my staff who have made repeated efforts to help her make the transition from her former activities to an industrial medicine practice." J.A. p. 245.
 
 
 20
 In light of plaintiff's allegations of sexism and racism, Conner asked Martin Marietta's Equal Employment Opportunity Department to conduct an investigation. In a report dated October 8, 1986, they concluded that there was no conscious race or sex discrimination on the part of Dr. Zanolli against plaintiff although his initial reaction to plaintiff was negative. The initial draft report by the investigators "speculated" that Dr. Zanolli was "conceivably" subconsciously biased. However, this language was deleted from the final report as "conjectural."
 
 
 21
 In December 1986, Dr. Zanolli rated plaintiff's performance for the period from March 1986 to September 1986 as "acceptable." Plaintiff also complained that this rating was unfair.
 
 
 22
 During the fall of 1987, Dr. Zanolli assessed plaintiff's performance as having improved dramatically. He recommended a "CX-rating" [consistently exceeds] for plaintiff as well as for the two other staff physicians and the two physician's assistants at the Y-12 Health Center.
 
 
 23
 Martin Marietta's performance review system had guidelines as to the number of people who could receive "CX" as well as other ratings. Only 22 percent to 27 percent of employees could qualify for a CX rating while over 60 percent of employees were expected to receive a CM [consistently meets] rating. In September, Conner reviewed Dr. Zanolli's rating. He modified the recommended ratings for plaintiff, a white male staff physician, and a white male physician's assistant, reducing them to "CM" from "CX."
 
 
 24
 Conner reduced plaintiff's rating because he felt she had not yet reached a level which consistently exceeded the standards for the company's physicians. According to Conner, it was not unusual for him to reduce ratings to meet Martin Marietta's guidelines and that the other twenty division managers do the same things.
 
 
 25
 In August 1988, Dr. Zanolli was demoted from Y-12 medical director to a staff physician. Dr. Conrad assumed the role of acting Y-12 medical director in addition to his usual duties. Dr. Conrad, thus, became responsible for evaluating Y-12 staff physicians, and he requested Zanolli's input. Zanolli recommended that all physicians and all physician's assistants be given a "CX" rating. Dr. Conrad and Harry Conner discussed the recommendation. Conrad rated plaintiff and a white male staff physician as "CM" instead of "CX."
 
 
 26
 However, plaintiff complains that some of the administrative decisions made by Dr. Conrad were discriminatory and constituted sex and race based harassment. One complaint concerns Dr. Conrad's decision to discontinue plaintiff's AIDS presentations and instead use a video prepared by the U.S. Surgeon General. However, plaintiff admitted that she had such an overwhelming number of requests for her AIDS presentation that it could have interfered with her work.
 
 
 27
 Plaintiff also complains that Dr. Conrad declined to allow her to attend a conference on Wellness in the Workplace in Long Beach, California, on April 27, 1989. Plaintiff made the request in the early part of March 1989. Dr. Conrad denied the request stating that the company had enough information on wellness as well as a tight fiscal budget. Plaintiff acknowledged that the Long Beach trip was the only such request that had ever been denied by the company.
 
 
 28
 Plaintiff also complains that Dr. Conrad denied her request of March 28, 1989, for "civic leave" to attend the Martin Marietta annual stockholders' meeting. Plaintiff believed she had been invited to attend the stockholders' meeting because she was President of the Oak Ridge branch of the NAACP. Subsequently, "civic leave" was approved, but plaintiff testified that she was told too late to make reservations and she did not go.
 
 
 29
 Subsequently, Martin Marietta sought to fill the Y-12 Medical Director position on a permanent basis. The company searched for the following qualifications:
 
 
 30
 An M.D. degree, state license (or eligibility), and 10 years of medical practice with at least 5 in occupational medicine are required. Demonstrated ability to interface with management and community leaders is highly desirable. Proven management skills and certification in occupational or aerospace medicine are a must."
 
 
 31
 J.A. p. 279.
 
 
 32
 Plaintiff applied for the position. Several other individuals applied including Dr. Otis Jones, the medical director of Martin Marietta's gaseous diffusion plant at Portsmouth, Ohio. Dr. Jones was board certified in aerospace medicine as well as already being a medical director, with extensive experience in that position, at one of the company's plants. Plaintiff, however, was not board certified in either occupational or aerospace medicine. In February 1989, Dr. Jones was selected for the position.
 
 
 33
 In November 1988, plaintiff applied for a medical director position with Amoco Corporation in Chicago, Illinois. In late February Amoco offered her the position at an annual salary of $85,000 per year. She made a house-hunting trip to Chicago on March 19-25, 1989, and wrote a letter of acceptance on April 9, 1989. Plaintiff also testified that she filled out an application accepting the Amoco position but held it in case she was offered the Y-12 Medical Director position.
 
 
 34
 On March 15, 1989, prior to the house-hunting trip to Chicago, Conner and Dr. Conrad informed plaintiff that Dr. Jones had been selected for the Y-12 Medical Director position. She immediately wrote to Mack Wilson, Martin Marietta's Human Resources Vice President, stating that she found the selection process "somewhat discriminatory" because she had not been interviewed by the medical staff. J.A. p. 302.
 
 
 35
 Dr. Conrad met with plaintiff on April 10, 1989, and was informed that she was challenging the selection process. At that time he informed her that he had not interviewed her or Dr. Jones because he had supervised them both and needed no interview for an assessment. Dr. Conrad also told her that her allegations of race and sex discrimination had been independently examined before and that no discrimination had been found. According to plaintiff, Dr. Conrad stated that if she was so unhappy, why didn't she quit.
 
 
 36
 Plaintiff testified that at that time she felt constructively discharged. Although she denied that she had accepted employment with Amoco prior to the April 10, 1989, meeting, she testified in a deposition that prior to April 10, she had given "tentative" agreement to Amoco.
 
 
 37
 On April 10, 1989, plaintiff sent a letter alleging discrimination in her November 1988 performance appraisal and in the selection of the Y-12 Medical Director. On April 12, 1989, Y-12 Plant Manager Fee requested that Martin Marietta's EEO department investigate the allegations. Plaintiff sent additional letters claiming discrimination on April 28, 1989. DOE requested an investigation of the complaints.
 
 
 38
 On August 4, 1989, the Y-12 EEO department reported that there did not appear to be any conscious race or sex bias on the part of Y-12 management. They also concluded that problems in the health center were management related rather than EEO related. They recommended that plaintiff's 1986-1987 performance rating either be revised back to "CX" or that management provide "substantive evidence of the need to reduce the rating." J.A. 330. Management decided not to change the performance rating; however, management did agree to attach written reasons for the decision to reduce plaintiff's performance rating to the 1987 appraisal. On May 1, 1989, plaintiff advised Mack Wilson, Martin Marietta Vice President of Personnel, that she was resigning effective May 25, 1989.
 
 
 39
 Finally, concerning plaintiff's Equal Pay Act claims, Martin Marietta has a Central Compensation Department, with responsibility for developing an overall compensation program and administering the annual salary increase programs. Martin Marietta has a structured, written compensation program for salaried employees. Pursuant to such program, each employee's job performance is reviewed annually, at a minimum, and merit increases are awarded commensurate with job performance.
 
 
 40
 Martin Marietta conducts salary surveys to maintain competitive starting salaries in its compensation program. The surveys are used to establish an appropriate salary range from which a midpoint of that range is calculated. The midpoint is used as a reference point in determining salary levels. Martin Marietta also uses internal equity to establish starting salaries. The starting salary of a physician is determined from the applicant's education and relevant experience in comparison with the physicians already on the staff.
 
 
 41
 Following negotiations, plaintiff's starting salary was established at $5,000 per month. Her starting salary was based on the fact that she had more than ten years of experience since medical school, including both administrative and educational roles. According to Martin Marietta, the $5,000 per month figure was 86 percent of the 1985 midpoint.
 
 
 42
 Another physician, a white male with 13 years experience, joined the Y-12 staff in December 1984 at the rate of $5,000 per month, the same rate plaintiff was paid. A white male with 21 years of experience joined the Y-12 staff in September 1986 at a salary of $5,417, 90 percent of the 1985 midpoint. A white male physician with seven years experience joined the Y-12 staff in March 1987 at a salary of $4,970 per month.
 
 
 43
 Five other staff physicians were employed at the Oak Ridge facilities before plaintiff was employed. One of the staff physicians was employed in 1980 at a salary of $3,375 per month and by 1985 his salary was $5,570 per month. Another physician came to Oak Ridge with 37 years experience; in 1985 he had 42 years total experience and his salary was at 96 percent of the midpoint. A third white male staff physician was employed at Oak Ridge in December 1966 at a salary of $1,325 per month. By June 1985, this physician's salary was $5,825, 100 percent of the midpoint. A fourth white male staff physician came to Oak Ridge in December 1978, with 27 years of private practice experience, at a salary of $3,375 per month. By June 1985, his salary was $5,550 per month, 96 percent of the midpoint. In August of 1989, after plaintiff left Martin Marietta, defendants hired a black male physician with two years more experience than plaintiff at $6,167 per month, 93 percent of the 1989 midpoint.
 
 
 44
 Martin Marietta employees are eligible for annual merit increases based upon their performance ratings from the previous year. The amount of such an increase is determined by the Company's guidelines. Following the July 1986 rating of plaintiff as "3-" or "acceptable minus" she received a salary increase of $300 per month in November 1986, which placed her at 88 percent of the 1986 midpoint. Based upon her "acceptable" rating given in December 1986, plaintiff received a salary increase of $212 per month in November 1987, which placed her salary at 89 percent of the midpoint. In June 1988, plaintiff received a raise of $170 per month. Plaintiff would have also received a 5 percent to 6 percent raise in June 1989 based upon her December 1988 "CM" rating; however, she resigned from Martin Marietta before this increase was due.
 
 B.
 
 45
 Plaintiff commenced this action on November 13, 1989, in the Chancery Court of Anderson County, Tennessee. The action was removed to federal district court on December 12, 1989, on the basis of federal question and diversity jurisdiction.
 
 
 46
 The action was tried before the district court in a bench trial on January 22 and 23, 1992. At the conclusion of plaintiff's proof, the district court entered a judgment pursuant to Federal Rule of Civil Procedure 52(c) against plaintiff on her race and sex discrimination claims under the THRA. Defendants then presented evidence only on plaintiff's Equal Pay Act claim. A partial order dismissing the THRA claims was entered on January 30, 1992. On February 11, 1992, the district court entered an order dismissing plaintiff's Equal Pay Act claim and dismissed the case. This timely appeal followed.
 
 II.
 
 47
 Plaintiff challenges the district court's conclusions regarding her various claims on the basis that the district court's underlying findings of fact are erroneous. In this case, where the district court served as the trier of fact, we will review its findings of fact under a clearly erroneous standard. See Federal Rule of Civil Procedure 52(a).
 
 A.
 
 48
 Plaintiff challenges the district court's holding that defendants did not violate the Equal Pay Act of 1963, 29 U.S.C. 206(d). A plaintiff establishes a prima facie case under the Equal Pay Act where he or she shows that an employer pays different wages to employees of the opposite sexes "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." EEOC v. Romeo Community Schools, 976 F.2d 985 (6th Cir.1992), quoting Corning Glass Works v. Brennan, 417 U.S. 188, 195 (1974). Because plaintiff was paid less than the average male staff physician for equal work, she has established a prima facie case.
 
 
 49
 Once the plaintiff has made her prima facie case, the burden shifts to the defendant to prove one of four affirmative defenses which "authorize an employer to differentiate in pay between sexes." Bence v. Detroit Health Corp., 712 F.2d 1024, 1029 (6th Cir.1983) (citation omitted), cert. denied, 465 U.S. 1025 (1984); see also Romeo Community Schools, 976 F.2d at 988, citing Corning Glass, 417 U.S. at 196. The district court found that plaintiff's salary at all times was determined according to a bona fide merit system which is one of the defenses. A merit system must be "an organized and structured procedure whereby employees are evaluated systematically according to predetermined criteria." Maxwell v. City of Tucson, 803 F.2d 444 (9th Cir.1986); EEOC v. Aetna Ins. Co., 616 F.2d 719, 725 (4th Cir.1980).
 
 
 50
 Plaintiff argues that the evidence shows that physicians were not evaluated according to predetermined criteria, that her evaluations were based on subjective and discriminatory standards, and that her increases were not within the guidelines of the company's pay plan. On the other hand, defendants assert that plaintiff, as were all physicians, was compensated on the basis of predetermined criteria: experience, education, seniority, and performance evaluations. Defendants note that because she received an unacceptable rating on her first evaluation she received no raise in March 1986 and that her following evaluation was rated only "acceptable minus."
 
 
 51
 A review of the record reveals no evidence which could lead to the conclusion that the district court was clearly erroneous in its findings on this issue. Those physicians with higher salaries than plaintiff possessed more experience and seniority. Plaintiff was hired in at the highest rate ever paid to a company physician at the Y-12 plant. A white male physician with three years more experience than plaintiff, who was hired at approximately the same time as plaintiff, was hired at the same rate as plaintiff. In addition, the fact that plaintiff initially received two low performance evaluations explains why her subsequent salary rates were not a higher percentage of the midpoint for her salary range. Furthermore, there is no evidence of race or sex discrimination in her performance evaluations.
 
 B.
 
 52
 Plaintiff argues that the district court erred in determining that defendant's decision not to promote her to the position of medical director was in violation of THRA, Tennessee Code Annotated § 4-21-401, which provides that it is a violation of the THRA for an employer to "[f]ail or refuse to hire or discharge any person or otherwise to discriminate against an individual with respect to compensation, terms, conditions or privileges of employment because of such individual's race ... [or] sex...."
 
 
 53
 The analysis used to evaluate a claim for discrimination in violation of the THRA is the same analysis used for a claim alleging discrimination brought under Title VII, 42 U.S.C. § 2000e et seq. See Silpacharin v. Metropolitan Government, 797 S.W.2d S.W.2d 625 (Tenn.App.1990).
 
 
 54
 The district court determined that Dr. Jones was selected as medical director over plaintiff because one of the qualifications for the position was certification in occupational medicine or aerospace medicine. Dr. Jones was certified in aerospace medicine, but plaintiff was not certified in either occupational medicine or aerospace medicine. The district court concluded, "There is absolutely nothing in the record to suggest that Martin Marietta selected a less qualified white male in order to avoid selecting a black, female physician. In fact, it is apparent to the Court that they chose the best qualified candidate for the position." J.A. at 43. We agree.
 
 C.
 
 55
 Plaintiff also asserts that the district court erred in failing to find that she had been constructively discharged. Plaintiff asserts that defendant's failure to select her for the Medical Director position at the Y-12 plant which was followed by the meeting with Dr. Conrad in which he stated to plaintiff at least once, and possibly more times, that if she was so unhappy at Martin Marietta, she should consider leaving, rightfully led her to believe that she had no career advancement possibility at Martin Marietta due to the attitude toward her as a black female. She argues that looking at the totality of the circumstances, a reasonable person would have considered employment elsewhere.
 
 
 56
 With regard to plaintiff's claim of constructive discharge, the district court stated:
 
 
 57
 While the Court recognizes that Dr. Conrad invited the plaintiff to leave Martin Marietta, it does not view the exchange of April 10, 1989, as a constructive discharge. In fact, the plaintiff had jumped to the mistaken conclusion that Dr. Conrad had interviewed Dr. Jones but not her, and launched another formal charge of race discrimination challenging a hiring procedure which Dr. Conrad had good reason to think was absolutely fair. There is every reason to suspect that he was angry with the plaintiff but it does not appear that he intended to discharge her or that it would have been impossible for the plaintiff to remain in her present position. The Court is of the firm impression that the plaintiff was unwilling to stay at Martin Marietta if she did not get promoted to the medical directorship and that she had another position lined up for that eventuality. The plaintiff could have stayed but, sensing that she was not likely to find career advancement possibilities at Martin Marietta, chose to resign.
 
 
 58
 J.A. pp. 43-44.
 
 
 59
 The issue as to whether or not a constructive discharge has occurred "is, at least partially, a question of law" and is subject to de novo review on appeal. See Yates v. Avco Corp., 819 F.2d 630, 636 (6th Cir.1987). The issue of constructive discharge depends upon the facts of each case and requires an inquiry into the intent of the employer and the reasonably foreseeable impact of the employer's conduct upon the employee. See Kreis v. Charles O. Townley, M.D. & Assoc., P.C., 833 F.2d 74, 82 (6th Cir.1987); Held v. Gulf Oil Co., 684 F.2d 427, 432 (6th Cir.1982). A constructive discharge occurs if working conditions are so unpleasant and unreasonable that a reasonable person in the employee's shoes would have felt compelled to resign. See Wilson v. Firestone Tire & Rubber Co., 932 F.2d 510, 515 (6th Cir.1991); Yates, 819 F.2d at 636-37; Held, 684 F.2d at 432. Proof of discrimination alone is not a sufficient predicate for a finding of constructive discharge; other "aggravating factors," such as a continuous pattern of discriminatory treatment, must be present. See Watson v. Nationwide Ins. Co., 823 F.2d 360, 361 (9th Cir.1987); Geisler v. Folsom, 735 F.2d 991, 996 (6th Cir.1984).
 
 
 60
 A finding of constructive discharge depends on whether a reasonable person would find the working conditions intolerable, rather than upon the subjective view of the employee-plaintiff. See Irving v. Dubuque Packing Co., 689 F.2d 170, 172 (10th Cir.1987). When an employee alleges that he was forced to resign, the employee's perception must be judged objectively without consideration of his undue sensitivities. Wilson, 932 F.2d at 515 (citing Henry v. Lennox Indus. Inc., 768 F.2d 746, 752 n. 3 (6th Cir.1985)). An employee has "an obligation not to assume the worst, and not to jump to conclusions too fast." Wilson, 932 F.2d at 515 (quoting Garner v. Wal-Mart Stores, Inc., 807 F.2d 1536, 1539 (11th Cir.1987)).
 
 
 61
 The determination as to whether working conditions were so intolerable and discriminatory as to justify a reasonable employee's decision to resign is normally a factual question left to the trier of fact. Watson, 823 F.2d at 361. However, as a matter of law, a "single isolated instance" of employment discrimination is insufficient for a finding of constructive discharge. Id. Furthermore, a failure to promote, an unlawful transfer, or unequal pay, standing alone, does not amount to a constructive discharge. Irving, 689 F.2d at 172. In this case, the district court's conclusion that plaintiff had already procured another job [at Amoco] at a higher salary and was unwilling to stay at Martin Marietta unless she was promoted to the Y-12 Medical Director position is supported by the record and is not clearly erroneous.
 
 
 62
 Plaintiff also asserts that her April 10, 1989, meeting with Dr. Conrad constituted a constructive discharge because he asked her if she was so unhappy why did she continue to work at Martin Marietta. In this case, the record also supports the district court's finding that Dr. Conrad did not mean to discharge plaintiff as a result of his statement. Although Dr. Conrad asked plaintiff why she continued to work at Martin Marietta if she was unhappy, he did not tell her that she was fired, nor did he tell her to leave the premises after their meeting. Cf. Brown v. Eckerd Drugs, Inc., 663 F.2d 1268, 1274 (4th Cir.1981), vacated, 475 U.S. 1128 (1982).
 
 
 63
 Because the record supports a finding that plaintiff could have stayed at Martin Marietta but chose to resign, a reasonable person in plaintiff's shoes would not have found working conditions so intolerable that they believed they had no option but to quit. Therefore, plaintiff was not constructively discharged from her staff physician position at Martin Marietta.
 
 D.
 
 64
 Finally, plaintiff argues that the district court erred in determining that defendants did not permit or create a hostile work environment arising from sex and race based harassment in violation of THRA, Tennessee Code Annotated § 4-21-401. First, plaintiff argues that certain events occurring before November 13, 1988, should be included in her claim of a hostile work environment to form a basis of a recovery even though Tennessee state law provides for a one-year statute of limitation in which to file such a claim. See Pinney Dock & Transp. Co. v. Penn Cent. Corp., 838 F.2d 1445, 1461 (6th Cir.1988), cert. denied, 488 U.S. 880 (1988).
 
 
 65
 Those events which the district court did consider in relation to plaintiff's hostile work environment claim were Dr. Conrad's decision to use the Surgeon General's AIDS presentation rather than allowing plaintiff to continue giving her presentation; his refusal to allow her to attend a conference on Wellness in the Workplace in Long Beach, California; his initial refusal to give her civic leave to attend the company's stockholder meeting in Denver, Colorado; and his reduction of her performance evaluation from a "CX" rating to a "CM" rating.
 
 
 66
 The district court stated, "[a]rguably any or all of these incidents could be racially or sexually discriminatory, but they could also be viewed as purely neutral, administrative decisions." J.A. 45. We agree. While it is plaintiff's belief that these incidents were racially and sexually motivated, there is no evidence in the record which demonstrates that the district court was clearly erroneous in concluding that these incidents were not motivated by race or sex considerations. A plaintiff cannot maintain a successful claim for race or sex based harassment resulting in a hostile work environment under the THRA unless the alleged harassment is motivated by race or sex based considerations. See e.g., Grissom v. Metro Government of Nashville, 817 S.W.2d 679 (Tenn.App.1991) (sexual harassment); Davis v. Monsanto Chemical Co., 858 F.2d 345 (6th Cir.1988) (racial harassment case under Title VII), cert. denied, 490 U.S. 1110 (1989); Henson v. City of Dundee, 682 F.2d 897, 903 (11th Cir.1982) (sexual harassment case under Title VII).
 
 
 67
 Plaintiff argues that even if certain incidents which occurred before November 13, 1988, cannot be included as those events upon which a recovery can be based, they should be considered as evidence of her employer's discriminatory animus against her based on race and sex. However, we do not find evidence of sex discrimination in these incidents either. For example, plaintiff argues that she was told by Dr. Zanolli shortly after she was hired that he opposed her hiring because he did not believe that "as a black female, she would be able to establish a rapport with the blue collar workers at Y-12 plant." Plaintiff's Reply Brief at 5. However, the record reveals that plaintiff testified at trial that Dr. Zanolli did not believe she could establish a rapport with the blue collar workers because he thought she was "arrogant" and possessed a "holier-than-thou attitude," not because she was a black female. J.A. 80.
 
 III.
 
 68
 For the reasons stated, the judgment of the district court is AFFIRMED.