EQUAL EMPLOYMENT OPPOR-TUNITY COMMISSION,
Plaintiff–Appellant,

v.

ROMEO COMMUNITY SCHOOLS; American Federation of State, County and Municipal Employees Local 2614, Defendants–Appellees.

No. 91–2181.

United States Court of Appeals,
Sixth Circuit.

Argued June 11, 1992.

Decided July 28, 1992.*

* This decision was originally issued as an "unpublished decision" filed on July 28, 1992. On September 10, 1992, the court designated the opinion as one recommended for full-text publication.

Jennifer S. Goldstein (argued and briefed), E.E.O.C., Office of the General Counsel, Washington, D.C., Bart M. Feinbaum, Detroit, Mich., for plaintiff-appellant.

Donald J. Bonato (argued and briefed), Kenneth Harned, Thrun, Maatsch & Nordberg, Lansing, Mich., Renate Klass, Miller, Cohen, Martens & Ice, Southfield, Mich., for defendants-appellees.

Before KEITH and SUHRHEINRICH, Circuit Judges; and CONTIE, Senior Circuit Judge.

PER CURIAM.

Plaintiff-appellant, the Equal Employment Opportunity Commission ("EEOC"), appeals the district court's grant of summary judgment in favor of defendants-appellees, Romeo Community Schools ("Romeo") and the American Federation of State, County and Municipal Employees Local 2614 (the "Union"), in this action alleging a violation of the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. For the reasons stated below, we REVERSE and REMAND for a trial on the merits.

I.

Sharon Gomes commenced employment with the Romeo Community Schools on April 7, 1988, as a "substitute" custodian at $5.50 per hour; her wage rate ultimately rose to $5.75 per hour. A "substitute" custodian is employed on an on-call basis to assume the responsibilities of a permanent custodian who will be absent for less than thirty days.

On June 2, 1988, Ms. Gomes began working as a "temporary" custodian. A "temporary" custodian is designated to fill in for a permanent custodian who plans to be absent for more than 30 days. Between 1986 and June 1988, Romeo paid male temporary custodians the entry-level rate for permanent custodians which was between $7.18 and $7.48 per hour. In her first pay check for her work as a temporary custodian, Romeo paid Ms. Gomes at the same rate as it had paid her as a substitute. This rate was more than a dollar an hour less than that paid to Ms. Gomes' male counterparts.

Ms. Gomes advised Dr. Mark Gualdoni, Romeo's Assistant Superintendent for Instruction and Personnel, of the disparity in the wage rates. Dr. Gualdoni informed Ms. Gomes that the disparity was a mistake, and that the male custodians should be receiving the lower rate that she had been paid. He acknowledged that prior to September 1986, it was the school district's policy to pay temporary custodians the higher rate. He stated, however, that in September 1986, when a new collective bargaining agreement was ratified, it was determined that temporary custodians were not part of the bargaining unit and would no longer be paid at an entry level permanent custodian rate, but would be paid at the substitute rate. Dr. Gualdoni further stated that the reason the male temporary custodians kept receiving the higher rate between September 1986 and June 1988, despite the policy change to reduce their pay rate, was that he inadvertently failed to notify the payroll office about the new policy.

According to Romeo, Ms. Gomes' inquiry brought it to their attention that the male temporary custodians' wage rate had not been reduced. Yet, when Patricia Bennett, another female substitute custodian, was assigned to work in a temporary position, her pay, like Ms. Gomes', was set at the lower substitute rate, not the permanent rate. Romeo did not explain why Ms. Ben-

nett's wage rate had been set at the lower rate in April 1988, two months prior to the time that Romeo was allegedly notified of the "mistake" in paying male temporary custodians at the higher rate.

Romeo agreed to pay Ms. Gomes at the higher rate paid to permanent custodians for the temporary assignment she began in June 1988. Her next paycheck compensated her at the higher rate and included an additional amount to make up for the underpayment in her first pay check. Romeo then, however, reduced all male temporary custodians' wages to the lower rate that Ms. Gomes had initially received in order to correct its alleged "mistake" in paying them the higher entry level rate for permanent custodians.

Ms. Gomes received another temporary assignment in October 1988. She again complained about her pay rate at the level of a substitute, but was told that her pay would not be raised during her temporary assignment. On October 26, 1988, she walked off the job. Romeo has not called her for substitute or temporary work since that time, although as of January 1989, she was still on the substitute custodian list. Romeo also has not considered Ms. Gomes for permanent custodial positions and instead has hired less senior substitute or temporary custodians for permanent jobs.

On January 5, 1989, Ms. Gomes filed a charge with the EEOC. On October 11, 1990, the EEOC commenced an action in the United States District Court for the Eastern District of Michigan. The complaint alleged that Romeo violated the Equal Pay Act when it paid Ms. Gomes less than it paid male employees for performing equal work, and for attempting to cure the violation of the Act by reducing the wages of male custodians to the lower rate. The complaint also alleged that Romeo unlawfully retaliated against Gomes "for her opposition to unlawful employment practices."

In granting summary judgment for Romeo, the district court held that the EEOC failed to establish the existence of a pay differential. The court acknowledged that Romeo initially paid Ms. Gomes less than male temporary custodians, but noted that Romeo eventually paid Ms. Gomes the same as the male custodians, "albeit after a protest was lodged." The court emphasized that when Romeo proceeded to reduce wages in 1988, the "reduction applied equally to both male and female substitute custodians in temporary positions." The court concluded that because the EEOC "failed to come forth with any evidence which shows a differential in pay, it has not met its burden [of establishing a *prima facie* case]."

The court also rejected the retaliation claims because all the alleged retaliatory acts occurred prior to Ms. Gomes' filing of a charge with the EEOC. According to the district court, "[t]o sustain an action for retaliation for the institution of a proceeding under this Act, a proceeding must be instituted prior to the alleged retaliatory act." The EEOC timely filed this appeal.

## II.

■ It is well settled that in order to establish a *prima facie* case under the Equal Pay Act, the EEOC must show that an employer pays different wages to employees of opposite sexes "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974).

■ This Court has held that a woman who receives less pay than a man for doing the same work "suffer[s] a denial of equal pay with each check she receive[s]." *Hall v. Ledex, Inc.*, 669 F.2d 397, 398 (6th Cir. 1982). *See also Dixon v. Anderson*, 928 F.2d 212, 216 (6th Cir.1991) (citing *Hall* for the proposition that "the employer commits an illegal act, such as giving unequal pay for equal work, *each time* the employer dispenses the pay") (emphasis in original). Here, it is undisputed that in June 1988, Romeo issued Ms. Gomes a paycheck which compensated her at a rate that was more than one dollar an hour less than Romeo

had up until that date consistently paid to males for performing the same job.

The district court found that the EEOC failed to establish a *prima facie* violation because Romeo alleged that the higher wage rate paid to males had been a mistake and corrected the pay disparity after Ms. Gomes complained so that there was no differential. The district court further believed that because Romeo also reduced the wage rate of similarly situated male temporary custodians, there was no disparity or evidence of violation of the Act.

The district court's finding was clearly erroneous. Although Romeo *temporarily* increased Gomes' wages in response to her complaint, it ultimately dealt with the disparity by reducing the wage rate it paid to all substitute custodians in temporary assignments. The Equal Pay Act expressly prohibits an employer who violates the Act from curing the violation by lowering the wages of male employees. The Act provides:

> [A]n employer who is paying a wage differential in violation of [the Act] shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

29 U.S.C. § 206(d)(1).

As this Court has observed, this provision means that once there is a violation of the Equal Pay Act, the "violation will continue until the company . . . raises, or is forced to raise, the wages of the female [employees] to that of the male [employees]." *Hodgson v. Square D Co.*, 459 F.2d 805, 809 (6th Cir.) (quoting *Shultz v. Saxonburg Ceramics, Inc.* 314 F.Supp. 1139, 1146 (W.D.Pa.1970), *cert. denied*, 409 U.S. 967, 93 S.Ct. 293, 34 L.Ed.2d 232 (1972)). *See also Corning Glass Works v. Brennan*, 417 U.S. 188, 207, 94 S.Ct. 2223, 2234, 41 L.Ed.2d 1 (1974) (to cure a violation of the Equal Pay Act "[t]he lower wage rate must be increased to the level of the higher"); *Hodgson v. Miller Brewing Co.*, 457 F.2d 221, 226–27 (7th Cir.1972) (employer violated Equal Pay Act by transferring higher-paid male technicians out of a lab and then allowing them back in at the lower, female-technician wage rate). The

rationale for the Act's proscription on lowering wage rates is that "[t]he objective of equal pay legislation . . . is not to drag down men workers to the wage levels of women, but to raise women to the levels enjoyed by men in cases where discrimination is still practiced." *Corning Glass*, 417 U.S. at 207, 94 S.Ct. at 2234. Because Romeo ultimately cured the disparity between male and female wage rates by lowering the male wage rate to the rate for females, a *prima facie* case has been established.

### III.

■ Romeo contends that this disparity was due to a mistake and that at the time it paid Ms. Gomes the lower rate, it should also have been paying male temporary custodians the lower rate due to a policy change. Romeo's argument about "mistake" is in the nature of a defense.

Because the district court believed that there was no *prima facie* violation of the Equal Pay Act, it never considered whether Romeo established an affirmative defense to liability. An employer can avoid liability under the Equal Pay Act for paying women less than men performing equal work if it can show that the unequal payments were "made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1). The employer has the burden of proving that one of these defenses applies. *Corning Glass*, 417 U.S. at 196, 94 S.Ct. at 2229.

Romeo contends that the alleged pay differential was based on a factor other than sex. Romeo alleged that in 1986 Dr. Gualdoni decided to change the existing policy of paying temporary custodians at the permanent rate, but neglected to tell anyone. Thereafter, according to Romeo, it paid male custodians on temporary assignments the permanent rate because the payroll office was still following the old policy. It paid Ms. Gomes the lower rate because, Romeo asserts, the mistake was discovered

when she received her temporary assignment.

Romeo bears the burden of proving this defense and is not entitled to summary judgment unless it has satisfied its burden of demonstrating that there is no genuine dispute on any material fact in regard to this issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *International Union, UAW v. Yard-man, Inc.*, 716 F.2d 1476, 1487–88 (6th Cir.1983), *cert. denied*, 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984).

We believe there is a genuine dispute of material fact that precludes a grant of summary judgment. In an affidavit, Dr. Gualdoni states that the policy on the pay rate for temporary custodians changed in September 1986 after union negotiations. That policy allegedly failed to be implemented for two years because the personnel office failed to notify the payroll office of the change and Romeo was unaware of this failure until June 1988. There is, however, substantial evidence contradicting this explanation. First, if what Dr. Gualdoni says is true and the school district was unaware of its mistake until June 1988, then the wage rate for Patricia Bennett would have been set at the higher wage rate in April 1988. This did not occur. Her wage rate was set at the lower rate. Second, there is an affidavit from Diane Downey, President of the Union, which states that after reviewing the minutes from the collective bargaining meeting in 1986, she found that "there [was] absolutely no mention that the school district indicated its desire not to pay substitute custodians assigned to temporary positions the hourly rate of pay for which [permanent custodians] were entitled." Furthermore, the affidavit states that defendant Romeo had attempted to get Downey to sign a prior affidavit which inaccurately described the manner in which substitute custodians were paid, and that she refused to sign it. In light of the above, we find that even if the court had considered Romeo's assertion that the pay disparity was based on a factor other than sex, it should not have granted summary judgment to Romeo because there is a genuine issue of fact concerning Romeo's explanation for the pay disparity.

## IV.

Next, plaintiff contends that the district court erred in granting summary judgment in favor of defendant regarding a claim for retaliation pursuant to 29 U.S.C. § 215(a)(3). Defendant argues that the Act should be strictly construed and a retaliation claim allowed only for actions occurring after the complaining employee has instituted formal proceedings with the EEOC. The district court adopted this position, stating that Ms. Gomes failed to state a claim for retaliation because the alleged retaliatory acts against her occurred before a formal charge was filed.

The district court's finding was clearly erroneous. In *Love v. RE/MAX of America, Inc.*, 738 F.2d 383 (10th Cir.1984), the Court held that "[t]he Act also applies to the unofficial assertion rights through complaints at work." *Id.* at 387. The *Love* Court held that it is the assertion of statutory rights which is the triggering factor, not the filing of a formal complaint. *Id.* This view is in accord with other circuits. *See Brennan v. Maxey's Yamaha, Inc.*, 513 F.2d 179, 181 (8th Cir.1975) (plaintiff asserted right at work and was fired immediately); *E.E.O.C. v. White and Son Enterprises*, 881 F.2d 1006, 1011 (11th Cir. 1989) (even though the charging parties had not yet filed formal charges with the EEOC, the discharge can still be retaliatory in nature); *Brock v. Richardson*, 812 F.2d 121, 124–25 (3rd Cir.1987) (an informal complaint by an employee is sufficient to bring employee under Act; a formal filing is not necessary).

Defendant concedes that before Ms. Gomes filed her charge, she had complained to the school district of unlawful sex discrimination and had told them she believed they were "breaking some sort of law" by paying her lower wages than previously paid to male temporary custodians. Because the adverse employment actions alleged by Ms. Gomes followed her pro-

tests, she has effectively set forth a claim of retaliation.

Defendant urges this Court to find that even if Ms. Gomes states a claim of retaliation, the school district had legitimate reasons for no longer hiring her. The district court made no findings in this regard, and the case must be remanded for a determination on this issue.

### V.

For the reasons stated above, we REVERSE the district court and REMAND the case for a trial on the merits consistent with this opinion.

SUHRHEINRICH, Circuit Judge, concurring in part and dissenting in part.

I concur with the majority in parts I, II, and III. As to part IV, however, I would affirm the grant of summary judgment on Gomes's retaliation claim. 29 U.S.C. § 215(a)(3) does not prohibit employers from taking adverse employment action, that is, retaliating, against employees generally. Rather, section 215(a)(3) protects from retaliation only those employees who engage in three expressly enumerated types of conduct. Specifically, those who have (1) filed a Fair Labor Standards Act ("FLSA")[1] complaint, (2) instituted an FLSA proceeding, or (3) testified in an FLSA proceeding. It is undisputed that Romeo Community Schools "adversely affected" Gomes's employment *before* she engaged in any of these three forms of protected conduct. Thus, Romeo cannot be said to have been motivated by Gomes's participation in protected activity, and section 215(a)(3), by its express terms, simply does not apply.

The majority recognizes that Romeo's action was not taken in response to any of the three expressly protected activities. Nevertheless, reasons the majority, Gomes did protest to Romeo that its conduct "br[oke] some sort of law." If Romeo is held to have adversely affected Gomes's employment because she opposed its unlawful employment practice, the argument continues, then Romeo has unlawfully retaliated against Gomes. Were this a Title VII action, I might agree. In addition to the types of conduct specified in section 215(a)(3), Title VII expressly includes an opposition clause, which protects employees who protest unlawful employment practices to their employers. *See* 42 U.S.C. § 2000e–3(a). Section 215(a)(3) contains no such provision and I cannot join the majority in reading one in.

I respectfully dissent from the majority's opinion as it relates to Gomes's section 215(a)(3) retaliatory discharge claim and concur in the remainder.

---

1. This includes lawsuits brought under the Equal Pay Act, 29 U.S.C. § 206(d)(1).