Carol A. TIMMER, Plaintiff–Appellant,

v.

MICHIGAN DEPARTMENT OF COMMERCE and Michigan Department of Civil Service, Defendants–Appellees,

United States of America, Intervenor.

No. 95–1706.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 6, 1996.

Decided Jan. 15, 1997.

Brandon W. Zuk (argued and briefed), Fraser, Trebilcock, Davis & Foster, Lansing MI, for Plaintiff–Appellant.

Denise C. Barton, Asst. Attorney Gen. (argued and briefed), Gary P. Gordon, Asst. Attorney Gen., Office of the Attorney General of Michigan, Lansing, MI, for Defendants–Appellees.

Jessica D. Silver, Seth M. Galanter (argued and briefed), U.S. Department of Justice, Civil Rights Division, Appellate Section, Washington, DC, for Intervenor.

Before: KENNEDY, BOGGS, and SILER, Circuit Judges.

KENNEDY, J., delivered the opinion of the court, in which SILER, J., joined. BOGGS, J. (pp. 845–847), delivered a separate opinion concurring in part and dissenting in part.

KENNEDY, Circuit Judge.

Plaintiff Carol A. Timmer appeals an order granting summary judgment to defendants[1] in this action under the Equal Pay Act (Act), 29 U.S.C. § 206(d). After finding that plaintiff had established a prima facie case of wage discrimination, the District Court concluded that defendant was entitled to summary judgment on its affirmative defense of a differential based on a factor other than sex, here a mistake as to the male co-worker's proper classification. We first conclude that *Seminole Tribe of Florida v. Florida,* — U.S. ——, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), does not deprive the federal court of jurisdiction to hear plaintiff's claim against the State. We then AFFIRM the District Court's grant of summary judgment.

## I. Facts

Plaintiff is employed in the Insurance Bureau, a part of the Michigan Department of Commerce (Department), in the Commercial Market Standards Division. In 1989, she was classified and paid as a Departmental Specialist VII. In her position as an analyst in the area of Liquor Liability, Claims–Made, and Pollution Liability, plaintiff was responsible for reviewing and approving or disapproving all forms and rates which were submitted by insurance companies.

John Esser also worked as an analyst in the Insurance Bureau. In 1989, the Department recommended that Esser be reallocated to the Departmental Specialist VIII position because his job entailed reviewing life insurance and credit card rates. At the time the recommendation was made, the Department's benchmark committee believed that life insurance policies were more complex than other forms of insurance because they also served as investment products. On or about April 30, 1989, Esser was reclassified as a Departmental Specialist VIII.

In October 1990, plaintiff sought a reclassification of her position from level VII to level VIII. The Department's benchmark committee reviewed the factors assigned to plaintiff's and Esser's positions and concluded that "all the program specialist positions in the division would most appropriately be classified at the VII level and that the committee had erred in factoring the Esser position" (JA at 134). Thus, while plaintiff's position was properly factored at level VII, Esser's factoring in 1989 had been "overly optimistic" (JA at 142). The committee issued a revised benchmark factor rating sheet

---

1. Although plaintiff has sued two state agencies in this action, she is essentially suing the State of Michigan. We will therefore refer to the defendants in the singular throughout this opinion.

for Esser and notified the Department of Civil Service (Civil Service).

After reviewing the committee's conclusions and performing a "desk audit," the Civil Service found that Esser's position was over-allocated one level. It recommended to the Department that it "restrict" Esser's position in accordance with the Civil Service's policy regarding the remedy to employ when an individual's position is over-allocated or no longer appropriate. Under the restriction policy, the Department would continue to pay Esser at his current salary level and would grant pay increases, but the next person who moved into his job would be classified as and receive pay in accordance with level VII.[2]

Plaintiff failed to have her position reclassified through administrative appeals. She then pursued this challenge in federal court under the Equal Pay Act, 29 U.S.C. § 206(d), seeking money damages. The parties filed cross-motions for summary judgment.

On May 19, 1995, the District Court granted defendant's motion for summary judgment. The District Court first found that plaintiff had established a prima facie case under the Equal Pay Act by showing that she was performing work equal to that of Esser, but that she was being paid a lower wage. However, the court found that defendant had met its burden of proving that a factor other than sex was the basis for the wage differential, thereby rebutting plaintiff's prima facie case. Because plaintiff had not shown that defendant's explanation was pretextual or that the pay differential was based on sex, the District Court concluded that as a matter of law defendant had not violated the Act. Plaintiff appeals this grant of summary judgment.

On May 22, 1996, this court asked the parties to file supplemental briefs addressing the issue of subject matter jurisdiction in view of the Supreme Court's decision in *Sem-*

*inole Tribe of Florida v. Florida,* —— U.S. ——, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), because the Equal Pay Act was expressly passed pursuant to the Interstate Commerce Clause, U.S. CONST., Art. I, § 8, cl. 3. Additionally, in accordance with FED. R.APP. P. 44, the Attorney General of the United States was notified that the constitutionality of the Equal Pay Act had been drawn into question. The United States intervened as of right under 28 U.S.C. § 2403(a) to defend the constitutionality of the Act.

## II. Discussion

### A. Subject Matter Jurisdiction

#### 1. Standard of Review

The District Court did not address the question of subject matter jurisdiction. The State of Michigan asserts an Eleventh Amendment defense in its supplemental brief. An Eleventh Amendment argument may be raised by a State for the first time on appeal. *Edelman v. Jordan,* 415 U.S. 651, 677–78, 94 S.Ct. 1347, 1362–63, 39 L.Ed.2d 662 (1974). Because the question of whether the Eleventh Amendment applies is a question of law, we determine the issue *de novo. Williams v. Kentucky,* 24 F.3d 1526, 1543 (6th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 358, 130 L.Ed.2d 312 (1994).

#### 2. Background

The Eleventh Amendment bars suits by all persons against a State in federal court.[3] *See Port Auth. Trans–Hudson Corp. v. Feeney,* 495 U.S. 299, 304, 110 S.Ct. 1868, 1872, 109 L.Ed.2d 264 (1990). However, the bar to suit is not absolute: States may consent to be sued in federal court or Congress may abrogate their sovereign immunity. *Id.* In this case, the State of Michigan has not consented to suit.

---

2. Since this suit was brought, the Civil Service has instituted a new classification system. Now, level 12 is equivalent to level VII and level 13 is equivalent to level VIII. As a result, the restriction on Esser's position has been removed. Both plaintiff and Esser are allocated and paid at level 13. However, the reclassification and pay raise are not retroactive.

3. The Eleventh Amendment provides:
 The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.
 U.S. CONST. amend. XI.

In *Seminole Tribe,* the Supreme Court considered whether Congress had properly abrogated the States' Eleventh Amendment immunity in passing the Indian Gaming Regulatory Act (IGRA) under the Indian Commerce Clause, U.S. CONST., Art. I, § 8, cl. 3. The Court held that although Congress had provided an "unmistakably clear" statement of its intent to abrogate, —— U.S. at —— ——, 116 S.Ct. at 1123–24, it had no power to do so under the Indian Commerce Clause, *id.* at —— —— ——, 116 S.Ct. at 1131–32, which the Court found to be indistinguishable, for purposes of Eleventh Amendment analysis, from the Interstate Commerce Clause, *see id.* at ——, 116 S.Ct. at 1127.

The Equal Pay Act of 1963, Pub.L. No. 88–38, 77 Stat. 56 (codified at 29 U.S.C. § 206(d)), was enacted by Congress as an amendment to the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201–219. It was based on a congressional finding that sex-based wage differentials have a substantial adverse impact on interstate commerce, and it accordingly required that all persons performing equal work must receive equal pay, unless the differential is justified by a consideration other than sex.[4] As with many civil rights statutes, the Equal Pay Act initially applied only to private employers, *see Marshall v. Owensboro–Daviess County Hosp.,* 581 F.2d 116, 117 (6th Cir.1978). In 1974, however, Congress extended the Act to the States. *See* Fair Labor Standards Amendments of 1974, Pub.L. No. 93–259, § 6, 88 Stat. 55, 58–62. Because Congress stated in the original version of the Equal

Pay Act that it was legislating pursuant to its powers under the Interstate Commerce Clause,[5] *Seminole Tribe* raises questions about the Act's constitutionality as applied to state employers.

### 3. Eleventh Amendment Analysis

■ In order to determine whether Congress has properly abrogated the States' sovereign immunity in the Equal Pay Act, we must apply the two-part test articulated in *Seminole Tribe:* "[F]irst, whether Congress has 'unequivocally expresse[d] its intent to abrogate the immunity' ... and second, whether Congress has acted 'pursuant to a valid exercise of power.' " —— U.S. at ——, 116 S.Ct. at 1123 (citation omitted) (quoting *Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 425–26, 88 L.Ed.2d 371 (1985)). We consider each of these questions in turn.

#### a. Intent to Abrogate

■ We agree with the parties, and with the other courts of appeals which have expressly addressed this issue, that the definitional and enforcement provisions applicable to the Act contain the necessary clear statement of Congress' intent to abrogate state sovereign immunity. *Brinkman v. Department of Corrections,* 21 F.3d 370, 372 (10th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 315, 130 L.Ed.2d 277 (1994); *Reich v. New York,* 3 F.3d 581, 590–91 (2d Cir.1993), *cert. denied,* 510 U.S. 1163, 114 S.Ct. 1187, 127 L.Ed.2d 537 (1994); *Hale v. Arizona,* 993

4. The Act provides in relevant part:

> (d)(1) No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided,* That an employer who is paying a wage rate differential in viola-

> tion of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.
> 29 U.S.C. § 206(d)(1).

5. Section 2 of the Equal Pay Act states:

> (b) It is hereby declared to be the policy of this Act, through exercise by Congress of its power to regulate commerce among the several States and with foreign nations, to correct [these] conditions ... in such industries.

Equal Pay Act of 1963, Pub.L. No. 88–38, § 2(b), 77 Stat. 56, 56. When Congress extended the Act to the States in 1974, it did not expressly state in the act itself the constitutional power pursuant to which it was legislating. *See* Fair Labor Standards Amendments of 1974, Pub.L. No. 93–259, § 6, 88 Stat. 55, 58–62. *But see infra* note 7.

F.2d 1387, 1391–92 (9th Cir.) (en banc), *cert. denied,* 510 U.S. 946, 114 S.Ct. 386, 126 L.Ed.2d 335 (1993).[6] The term "employer" is defined in the FLSA to "include[ ] a public agency," which in turn is defined as "the government of a State or political subdivision thereof" and any agency of a State. 29 U.S.C. §§ 203(d), (x). The term "employee" is defined to include "any individual employed by a State, political subdivision of a State, or an interstate governmental agency." *Id.* § 203(e)(2)(C). Finally, the private enforcement provision provides that "[a]n action to recover the liability prescribed ... may be maintained against *any employer (including a public agency)* in any *Federal* or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." *Id.* § 216(b) (emphasis added). Accordingly, we find that Congress clearly intended through the Equal Pay Act to abrogate the States' sovereign immunity from suit.

### b. Power to Abrogate

■ We must next determine whether the Act was enacted pursuant to a constitutional provision granting Congress the power to abrogate. *See Seminole Tribe,* — U.S. at —, 116 S.Ct. at 1125. The *Seminole Tribe* Court noted that it had previously found authority to abrogate state sovereign immunity under only two provisions of the Constitution: § 5 of the Fourteenth Amendment, in *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), and the Interstate Commerce Clause, in *Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989). *Id.* However, the Court overruled *Union Gas* and held that "[t]he Eleventh Amendment restricts the judicial power under Article III, and Article I

cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction." *Id.* at — – —, 116 S.Ct. at 1131–32.

■ Nevertheless, § 5 of the Fourteenth Amendment remains a provision that vests Congress with the power to abrogate Eleventh Amendment immunity. *See id.* at —, 116 S.Ct. at 1125; *see also id.* at — n. 15, 116 S.Ct. at 1131 n. 15 (criticizing Justice Stevens' dissent for ignoring the fact that many of the cases he used to support his argument "arose in the context of a statute passed under the Fourteenth Amendment, where Congress' authority to abrogate is undisputed"). As the *Fitzpatrick* Court explained, the Fourteenth Amendment, adopted well after the adoption of the Eleventh Amendment, expanded federal power at the expense of state autonomy, and thereby fundamentally altered the pre-existing balance between state and federal power achieved by Article III and the Eleventh Amendment. 427 U.S. at 453–56, 96 S.Ct. at 2670–71. In *Seminole Tribe,* the Court reaffirmed this view of § 5. — U.S. at —, 116 S.Ct. at 1128.

■ In *Marshall v. Owensboro-Daviess County Hospital,* 581 F.2d 116, 119 (6th Cir.1978), this Circuit held, in response to a Tenth Amendment challenge, that the extension of the Equal Pay Act to state employees was a valid exercise of Congress' power under § 5 of the Fourteenth Amendment. *Accord Usery v. Charleston County Sch. Dist.,* 558 F.2d 1169, 1170–71 (4th Cir.1977); *Usery v. Allegheny County Inst. Dist.,* 544 F.2d 148, 155 (3d Cir.1976), *cert. denied,* 430 U.S. 946, 97 S.Ct. 1582, 51 L.Ed.2d 793 (1977). We acknowledged that Congress did not expressly state the constitutional basis of its extension of the FLSA to the States in 1974,[7] but we found such action with respect to the

---

**6.** These cases dealt with Eleventh Amendment challenges to the minimum wage or overtime provisions of the FLSA. However, the Equal Pay Act was enacted as part of the FLSA, *see* Pub.L. No. 88–38, § 3, 77 Stat. 56, 56–57, and it employs the same definitional and enforcement sections as do the minimum wage and overtime provisions, *see* 29 U.S.C. §§ 203, 206, 216.

**7.** Two points deserve attention regarding the *Owensboro-Daviess* court's finding that ·Congress had not expressly stated the constitutional basis

of its extension of the FLSA to the States in 1974. First, the court properly focused on the 1974 amendments as opposed to the 1963 version of the Equal Pay Act. Although the 1974 legislation was an amendment to an already existing act, it was nevertheless a separate act of Congress. Here, we must determine whether Congress had the power to abrogate state sovereign immunity. Congress sought to abrogate that immunity in the 1974 act, and we must consequently decide whether Congress had the power to do so

Equal Pay Act authorized by § 5 of the Fourteenth Amendment.[8] *See* 581 F.2d at 119. Moreover, we explained that "[i]t was not necessary for Congress to expressly rely on § 5 in exercising its power because such power clearly existed." *Id.* at 120. " 'In exercising the power of judicial review, as distinguished from the duty of statutory interpretation, we are concerned with the actual powers of the national government.' " *Id.* (quoting *Allegheny County Inst. Dist.*, 544 F.2d at 155); *see also Charleston County Sch. Dist.*, 558 F.2d at 1171 ("Our duty in passing on the constitutionality of legislation is to determine whether Congress had the authority to adopt legislation, not whether it correctly guessed the source of that power.").

 *Owensboro–Daviess* compels us to find that a federal court has jurisdiction to consider actions brought by employees

through that act. Thus, it is appropriate to look at the 1974 act and its legislative history to determine whether Congress stated its intent to pass that legislation pursuant to a particular constitutional provision. We therefore dispute the dissent's apparent reliance on Congress' statement in § 2 of the original Equal Pay Act that it was legislating pursuant to its powers under the Commerce Clause, *see supra* note 5. *See infra* pp. 845–846. Indeed, because the Fourteenth Amendment applies only to state action, Congress would have had no motivation to act pursuant to § 5 in 1963 when the Act applied only to private employers.

Second, the legislative history of the 1974 amendments does not contain an express statement of Congress' intent with regard to the Equal Pay Act. Defendant argues that Congress expressly stated in the legislative history that it was extending the FLSA to the States pursuant to its commerce clause powers. Specifically, it refers to the following statement in a Senate report:

There are a number of reasons to cover employees of State and local governments. The Committee intends that government apply to itself the same standards it applies to private employers. This principle was manifested in 1972 when the Senate overwhelmingly voted to apply Federal equal employment opportunity standards to public sector employers. Equity demands that a worker should not be asked to work for subminimum wages in order to subsidize his employer, whether the employer is engaged in private business or in government business. The Senate has also applied wage ceilings to the wages paid public employees. The Committee sees no reason, therefore, why these employees should not be protected by the wage floor provided by the FLSA.

against their state employers under the Equal Pay Act. We have long held that "[a] panel of this Court cannot overrule the decision of another panel. The prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision." *Salmi v. Secretary of Health and Human Servs.*, 774 F.2d 685, 689 (6th Cir.1985). Defendant asserts that we should overrule *Owensboro–Daviess* because (1) we only assumed that Congress was relying on the Fourteenth Amendment; (2) we relied on the legislative history of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, to support the view that Congress exercised its § 5 authority when it enacted the Equal Pay Act; and (3) *Seminole Tribe* calls that decision into question.

The Committee believes that there is no doubt that the activities of public sector employers affect interstate commerce and therefore that the Congress may regulate them pursuant to its power to regulate interstate commerce. Without question, the activities of government at all levels affect commerce.

S.Rep. No. 93–690, 93d Cong.2d Sess. 24 (1974). We agree that this excerpt suggests that at least the Senate Committee on Labor and Public Welfare, which wrote the report, believed that it had the power to extend the FLSA to the States under the Commerce Clause.

However, we question reliance on this passage as proof of *an express statement* of the constitutional basis for extending the *Equal Pay Act* to the States. A careful and thorough reading of S.Rep. No. 93–690 reveals that Congress was primarily concerned with extending the overtime provisions to and increasing the minimum wage for as many workers as possible. The Equal Pay Act was not mentioned in the report's discussion of the substantive changes being made to the FLSA. Indeed, the Equal Pay Act was mentioned only once in the 116 page report, and that was in the committee's recitation of the historical background of the FLSA. *See* S.Rep. No. 93–690, *supra*, at 6. We believe that this legislative history falls far short of constituting an "express statement" of congressional intent.

8. Although we did not state the specific Fourteenth Amendment provision involved, the Equal Pay Act is an anti-discrimination measure and as such we clearly meant that it should be viewed as an exercise of Congress' power to adopt legislation enforcing the Fourteenth Amendment's guarantees of equal protection of the law. *See Charleston County Sch. Dist.*, 558 F.2d at 1170, *cited in Owensboro–Daviess*, 581 F.2d at 119.

We reject defendant's arguments. First, "[t]he ... constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise." *Woods v. Cloyd W. Miller Co.,* 333 U.S. 138, 144, 68 S.Ct. 421, 424, 92 L.Ed. 596 (1948); *see also Ramirez v. Puerto Rico Fire Serv.,* 715 F.2d 694, 698 (1st Cir.1983); *EEOC v. Elrod,* 674 F.2d 601, 608·(7th Cir. 1982). Moreover, we reject defendant's argument that if "Congress must articulate a 'clear statement' of its intent to abrogate the States' sovereign immunity, then *a fortiori,* Congress must articulate the basis or bases upon which its power is being exercised." Supplemental Brief for Appellees at 16. In *EEOC v. Wyoming,* 460 U.S. 226, 243 n. 18, 103 S.Ct. 1054, 1064 n. 18, 75 L.Ed.2d 18 (1983), the Supreme Court, albeit in dicta,[9] rejected this argument. The Court explained: "[W]hatever else may be said about the § 5 question in this case, the District Court erred in reading *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1 [101 S.Ct. 1531, 67 L.Ed.2d 694] (1981), as holding that congressional action could not be upheld on the basis of § 5 unless Congress 'expressly articulated its intent to legislate under § 5'....'" 460 U.S. at 243 n. 18, 103 S.Ct. at 1064 n. 18 (quoting 514 F.Supp. at 600). Although a court must be able to discern support for the exercise of § 5 power, "[t]hat does not mean ... that Congress need anywhere recite the words 'section 5' or 'Fourteenth Amendment' or 'equal protection.'" *Id.* Furthermore, consistent with what we said in *Owensboro–Daviess,* 581 F.2d at 120, the Court distinguished between statutory construction, for which the clear statement rule is a tool, and the question of whether Congress has acted pursuant to § 5 where it clearly intended to abrogate state sovereign immunity, for which the clear statement rule "ha[s] no relevance." 460 U.S. at 243 n. 18, 103 S.Ct. at 1064 n. 18.

Contrary to the dissent's contention, *Pennhurst* does not call into question our analysis in· *Owensboro–Daviess* and, in fact, it supports our adhering to precedent here. The issue in *Pennhurst* was whether Congress, in enacting the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. § 6010, intended to place an obligation on the States to provide certain kinds of treatment to the disabled. *See* 451 U.S. at 15, 101 S.Ct. at 1538–39. The Court held that it did not. *Id.* at 11, 101 S.Ct. at 1536–37. In making this determination, the Court looked to possible sources of Congress' power to legislate and, in so doing, considered the appropriate test for determining when Congress intends to enforce the guarantees of the Fourteenth Amendment. *Id.* at 15–16, 101 S.Ct. at 1538–39. The Court explained that "[b]ecause such legislation imposes congressional policy on a State involuntarily, and because it often intrudes on traditional state authority, we should not quickly attribute to Congress an unstated intent to act under its authority to enforce the Fourteenth Amendment." *Id.* at 16, 101 S.Ct. at 1539.

While *Pennhurst* does limit a court's ability to find that Congress intended to act pursuant to the Fourteenth Amendment, the dissent would have us believe that *Pennhurst* prohibits any such determination where Congress has not expressly stated its intent or has stated its intent to legislate under a constitutional provision other than § 5. We interpret *Pennhurst* differently. First, the so-called "*Pennhurst* rule" says only that a court should not "*quickly* attribute" to Congress an unstated intent to act pursuant to § 5. *Id.* (emphasis added). This suggests only that a court should carefully consider the propriety and effect of concluding that Congress has acted pursuant to § 5. Second, the Court went on to distinguish between two kinds of cases: those where "statutes ... simply prohibited certain kinds of state conduct" and those like the one before

---

9. In *EEOC v. Wyoming,* the district court held that the application of the Age Discrimination in Employment Act (ADEA) to the States could not be justified as an exercise of Congress' power under § 5 of the Fourteenth Amendment. 514 F.Supp. 595, 600 (1981). The Supreme Court held that this application of the ADEA was a valid exercise of Congress' powers under the Commerce Clause. 460 U.S. at 243, 103 S.Ct. at 1064. Therefore, the Court stated that it did not have to decide whether the ADEA also could be upheld under § 5. *Id.* Nevertheless, it responded in a footnote to aspects of the district court's holding regarding § 5. *Id.* at 243 n. 18, 103 S.Ct. at 1064 n. 18.

the Court in *Pennhurst,* where the "case for inferring intent is at its weakest where … the rights asserted impose *affirmative* obligations on the States to fund certain services, since we may assume that Congress will not implicitly attempt to impose massive financial obligations on the States." *Id.* at 16–17, 101 S.Ct. at 1539–40. In other words, the Court did not suggest that a court should *never* infer a congressional intent to legislate pursuant to § 5 of the Fourteenth Amendment, but rather that it should first consider a number of factors before making such an inference. In addition, while the cases cited by the Court involved statutes in which Congress had expressly stated an intent to legislate pursuant to § 5, and as such were "consistent" with the *Pennhurst* rule, *see id.* at 16, 101 S.Ct. at 1539, the Court did not suggest that these cases excluded the possibility of inferring intent in appropriate circumstances. Indeed, the *Pennhurst* Court's discussion serves to provide a court with guidelines for undertaking such an analysis. Finally, *Pennhurst* does not address whether a court can infer an intent to legislate under a particular provision of the Constitution when Congress has expressly stated that it is legislating under a different constitutional provision, the scenario that the dissent believes exists in this case.

We do not hold, as the dissent suggests, *see infra* pp. 844–845, that a court can *always* assume that Congress legislated under its § 5 Fourteenth Amendment power if such action would be constitutional. *Pennhurst* clearly restrains our power to do so. Nor do we hold that a clear statement by Congress that it is acting pursuant to a particular constitutional provision should always be ignored. Indeed, we believe that, in this case, Congress has not in fact "expressly stated" an intent to act pursuant to any particular constitutional provision. *See supra* note 7. We hold only that here, where the Equal Pay Act does not fall into that category of statutes where the "case for inferring intent is at its weakest" but rather "simply prohibit[s] certain kinds of state conduct," *Pennhurst,*

451 U.S. at 16, 101 S.Ct. at 1539, and where Congress clearly intended to impose congressional policy on the States, *see supra* part II.A.3.a, but did not expressly state the constitutional provision pursuant to which it was legislating, *see supra* note 7, the *Owensboro–Daviess* court appropriately inferred a congressional intent to act pursuant to § 5 of the Fourteenth Amendment.

In terms of defendant's second assertion regarding the continuing validity of *Owensboro–Daviess,* we find that we did not rely on the legislative history of Title VII in *Owensboro–Daviess.* Rather, we relied on the *Fitzpatrick* Court's holding that Congress' power under § 5 of the Fourteenth Amendment was sufficient to support the application to state employment of the *sex discrimination* provisions of Title VII. 581 F.2d at 119–20; *see also Charleston County Sch. Dist.,* 558 F.2d at 1171; *Allegheny County Inst. Dist.,* 544 F.2d at 155; *cf. Korte v. Diemer,* 909 F.2d 954, 957–59 (6th Cir.1990) (discussing the close relationship between Title VII and the Equal Pay Act). Given the similarity between the purposes of Title VII and those of the Equal Pay Act, *compare* 42 U.S.C. § 2000e–2(a) *with* 29 U.S.C. § 206(d), we not surprisingly found that "[t]he reasoning of the Court in *Fitzpatrick* applies with equal force to the extension of the Equal Pay Act to the States." *Owensboro–Daviess,* 581 F.2d at 120.[10]

Finally, *Seminole Tribe* does not overrule *Owensboro–Daviess* nor is it inconsistent with that case. To the contrary, the Court's decision does not question the holding of *Fitzpatrick, see* —— U.S. at ——, —— n. 15, 116 S.Ct. at 1125, 1131 n. 15, upon which we relied, and it in fact emphasizes the distinction between the Interstate Commerce Clause and § 5 of the Fourteenth Amendment in terms of the Eleventh Amendment, *id.* at ——, 116 S.Ct. at 1128. *Seminole Tribe* says nothing about the situation presented here where there is a question about whether Congress legislated pursuant to an

---

**10.** Although the *Fitzpatrick* Court noted that there was no dispute that Congress had exercised its power under § 5 when it extended Title VII to the States, 427 U.S. at 453 n. 9, 96 S.Ct. at 2670

n. 9, we have rejected defendant's argument that Congress must expressly state the power pursuant to which it has acted.

unstated constitutional provision.[11] Furthermore, *Pennhurst* does not proscribe judicial inferring of congressional intent, but rather warns that it should be done with care. Thus, neither case suggests that we should not adhere to this Circuit's precedent in *Owensboro–Daviess*. When Congress extended the Equal Pay Act to the States in 1974, it clearly intended to prohibit the States from establishing sex-based wage differentials. *See supra* part II.A.3.a. It had the power to do so under § 5 of the Fourteenth Amendment. *See Owensboro–Daviess*, 581 F.2d at 119. We discerned no persuasive reasons in *Owensboro–Daviess*, and we discern none now, why the courts should frustrate that intent simply because the legislative history does not contain the words "§ 5 of the Fourteenth Amendment." In sum, we find no grounds for overruling this precedent of our Circuit.

### 4. Conclusion

We emphasize that this suit concerns a claim under the Equal Pay Act for discrimination based on sex. Although the Equal Pay Act and the minimum wage provisions of the FLSA are located in the same section, they are distinct provisions with different goals. The legislative history establishes that the Act was added to the FLSA primarily to utilize the existing administrative and enforcement machinery in the interest of effi-ciency. H.R.Rep. No. 309, *reprinted in* 1963 U.S.C.C.A.N. 687, 688; *see also Marshall v. City of Sheboygan*, 577 F.2d 1, 4–5 (7th Cir.1978). Moreover, the FLSA contains a broad severability clause. 29 U.S.C. § 219. Therefore, it does not control our decision that this Court has held that the FLSA's minimum wage and maximum hour provisions are unconstitutional as applied to the States. *See Wilson–Jones v. Caviness*, 99 F.3d 203, 205–06 (6th Cir.1996). We hold here that Congress has the power to abrogate the States' sovereign immunity under the Equal Pay Act pursuant to § 5 of the Fourteenth Amendment. Accordingly, we have jurisdiction to consider this case.

### B. Summary Judgment

#### 1. Standard of Review

 Having disposed of the question of subject matter jurisdiction, we now proceed to review the District Court's order granting defendant's motion for summary judgment. We review a grant of summary judgment *de novo*, making all reasonable inferences in favor of the non-moving party. *EEOC v. University of Detroit*, 904 F.2d 331, 334 (6th Cir.1990). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and

---

11. "Petitioner ... accept[s] the lower court's conclusion that the Act was passed pursuant to Congress' power under the Indian Commerce Clause...." *Seminole Tribe,* — U.S. at —, 116 S.Ct. at 1125.

In *Seminole Tribe,* the Eleventh Circuit had rejected the plaintiff's § 5 argument, holding that the IGRA created no liberty or property interest and thus could not implicate the Fourteenth Amendment. 11 F.3d 1016, 1025 (11th Cir. 1994). On appeal, the Court noted only that petitioner did not challenge this conclusion of the appellate court. — U.S. at —, 116 S.Ct. at 1125. The government argues that this merely reflects the Court's general policy of declining to review arguments not raised by the parties. Yet the Eleventh Amendment acts as a "jurisdictional bar," *Edelman v. Jordan,* 415 U.S. 651, 678, 94 S.Ct. 1347, 1363, 39 L.Ed.2d 662 (1974), and a federal court will recognize *sua sponte* that it does not have jurisdiction, *see Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 278, 97 S.Ct. 568, 571–72, 50 L.Ed.2d 471 (1977). The government's argument suggests that *Seminole Tribe* could mean that a court may not recognize that it *does* have jurisdiction because the parties did not raise the winning argument. Nevertheless, *Seminole Tribe* does not suggest that a court should not consider all possible grounds in construing the constitutionality of an act as applied to the States. For example, in *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), the Court first concluded that Congress had the power under the Commerce Clause to enact the relevant statutory provision as applied to private parties, *id.* at 475, 100 S.Ct. at 2773, and then stated that because "there are limitations on the reach of the Commerce Power to regulate the actions of state and local governments[,] ... we look to § 5 of the Fourteenth Amendment," *id.* at 476, 100 S.Ct. at 2773; *see also EEOC v. Elrod,* 674 F.2d 601, 608 n. 7 (7th Cir.1982) ("The [*Fullilove*] Court was unconcerned that the legislative history made no explicit reference to the amendment. Rather, the analysis was based on whether the objectives of the act were within the scope of the Fourteenth Amendment" (citations omitted)).

that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In addition, if the moving party will bear the burden of persuasion at trial, then that party must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial. *See Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53.

### 2. Prima Facie Case

■■■ The Equal Pay Act prohibits wage discrimination "between employees on the basis of sex ... for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1). A plaintiff alleging a violation of the Act must make a prima facie showing that the employer paid different wages to an employee of the opposite sex for substantially equal work. *See Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974).

Defendant does not dispute that plaintiff has established a prima facie case under the Act, using John Esser as the comparator. Plaintiff's prima facie case is best viewed as consisting of two parts. First, she argues that a male co-worker, Esser, was classified a level higher than she, but that their positions were substantially the same. Second, she contends that defendant has continued to violate the Act, even though it is aware of the misclassification, through its restriction policy.[12] Defendant admits that the positions of plaintiff and Esser "were roughly the same" (JA at 9), and it admits that Esser's position has been restricted, thereby perpetuating the wage differential while he holds the position. Thus, plaintiff has proven a prima facie case of wage discrimination under the Act.

### 3. Defendant's Affirmative Defenses

■■■ However, not all differences in pay for equal work constitute violations of the Act. Once the plaintiff has carried her burden of proving a prima facie case of wage discrimination, the burden shifts to the employer to establish by a preponderance of the evidence that the differential is due to: (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) any other factor other than sex. 29 U.S.C. § 206(d)(1); *see Corning Glass Works*, 417 U.S. at 196–97, 94 S.Ct. at 2229. Moreover, the burden of proving that a factor other than sex is the basis for a wage differential is a heavy one. *Brennan v. Owensboro–Daviess County Hosp.*, 523 F.2d 1013, 1031 (6th Cir.1975), cert. denied, 425 U.S. 973, 96 S.Ct. 2170, 48 L.Ed.2d 796 (1976). If proven, though, the defendant is absolved of liability as a matter of law. *Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 591 (11th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 298, 130 L.Ed.2d 212 (1994).

Defendant relies on two affirmative defenses. First, it asserts that the initial wage disparity resulted from an inadvertent misapplication of a bona fide (sex-neutral) job classification system. Second, defendant contends that the continuation of the wage disparity through application of the wage restriction policy to Esser's position falls within the merit system exception or constitutes a factor other than sex. Plaintiff argues that defendant cannot assert "mistake" or its restriction policy as affirmative defenses under the Act. We disagree.

### a. Mistake Defense

■■■ This Circuit has acknowledged that an employer's argument that a wage disparity was due to a mistake is a defense within the fourth exception of the Act. *See EEOC v. Romeo Community Schs.*, 976 F.2d 985, 988–89 (6th Cir.1992). In *Romeo Community Schools*, we concluded that the plaintiff had proven a prima facie case under the Act and went on to consider the employer's affirmative defense that the disparity was due to a mistake. *Id.* We determined that a genuine dispute of material fact precluded a grant of summary judgment, but not because

---

12. Although at oral argument plaintiff appeared to have conceded the claim against defendant's application of its restriction policy, we shall address this argument because it has been fully briefed and was considered by the District Court.

we found a defense of mistake invalid. *Id.* at 989. Rather, we found that certain contradictory facts suggested that a "mistake" was not the true reason for the wage disparity. *Id.* In other words, an employer may argue that a wage disparity is due to a mistake, *i.e.* a factor other than sex, but, as with all affirmative defenses under the Act, the employer must prove that "'sex provides *no part* of the basis for the wage differential.'" *Owensboro–Daviess*, 523 F.2d at 1031 (emphasis added) (quoting 29 C.F.R. 800.142 (1974)).

Here, defendant showed that when Esser's position was reclassified in 1989, the committee that factored his position was advised that life insurance policies could be considered more complex than other types of insurance. Further, it was told that the credit insurance area was a lucrative line of business for insurance companies and that, as a result, the companies would submit materials for approval that would make the program specialist's job more complicated and complex. In 1991, when plaintiff's position was reviewed, the committee found that it had been "overly optimistic" when it had factored Esser's position, although if the program specialist positions were "viewed in a spectrum, the Timmer position would fall towards the low end of the VII level and the Esser position would come out on top of the VII level." Given the elaborate civil service system defendant must apply, we are not surprised that unfortunate errors occur, but as long as such errors are sex-neutral, they are not violations of the Act. *Cf. Marshall v. J.L. Hudson Co.*, No. 4–72932, 1979 WL 1850, at *6 (E.D.Mich. Feb.28, 1979) (acknowledging that "mistake" may be a defense in the context of an elaborate civil service system).

In sum, defendant has come forward with substantial evidence that the wage disparity was caused by an inadvertent misapplication of the job classification system. There is no evidence to the contrary. While under the Act the plaintiff is not required to prove pretext, she still must come forward with evidence demonstrating the existence of a triable issue of fact. *See* Fed.R.Civ.P. 56(e). She has not done so.

### b. Restriction Policy Defense

■ Although defendant argues that the restriction policy falls under the merit system defense, we think its alternative argument—that the policy creates a "red-circle" rate which results in a disparity based on a "factor other than sex"—is the correct one. The Act's regulations specify that a "red-circle rate" can be a valid "factor other than sex." 29 C.F.R. § 1620.26 (1995). Generally defined, the term "red-circle" rate describes certain unusual, higher than normal, wage rates which are maintained for reasons unrelated to sex. *Id.* The legislative history of the Act indicates that Congress intended to include the practice of "red circling" as a § 206(d)(1)(iv) "factor other than sex" to explain a wage differential. *See* H.R.Rep. No. 309, 88th Cong., 1st Sess. 3 (1963), *reprinted in* 1963 U.S.C.C.A.N. 687, 689.

Defendant's evidence shows that as soon as the mistake was brought to its attention, it undertook to remedy the situation by restricting Esser's position in accordance with the rules of the Michigan Civil Service Commission. Defendant demonstrated that the restriction policy is sex-neutral and has been applied when the Civil Service has determined that a position has been over-allocated. Such a policy avoids demoralizing employees whose classifications have changed through no fault of their own.

Plaintiff argues that defendant's policy does not fall within the examples listed in the regulations. *See* 29 C.F.R. § 1620.26. However, the regulations merely provide illustrations of legitimately maintained red-circle rates. "Red circling" has yet to be defined in all of its manifestations. "The flexibility of the red circling concept has been preserved in anticipation of the need to reconcile legitimate business interests with the Act's purpose." *Gosa v. Bryce Hosp.*, 780 F.2d 917, 919 (11th Cir.1986).

This is not a situation where "wage rate differentials have been or are being paid on the basis of sex to employees performing equal work, [and the] rates of the higher paid employees may not be 'red circled' in order to comply with the Act." 29 C.F.R. § 1620.26. Such a situation would indeed per-

petuate the inequities that Congress intended the Act to cure. Here, however, the record establishes that the wage differential that existed before Esser's job was restricted was not the product of unlawful, sex-based discrimination. The evidence further shows that the restriction policy was not based on considerations of sex and was not discriminatory in application.

### 4. Conclusion

In sum, defendant met its burden of proving a nondiscriminatory basis for the pay differential between plaintiff and Esser. The record shows that there is no genuine issue as to any material fact, and defendant is entitled to a judgment as a matter of law.

### III.

For the foregoing reasons, we hold that a federal court has jurisdiction to hear claims against state employers under the Equal Pay Act, and we AFFIRM the District Court's grant of summary judgment to defendant.

BOGGS, Circuit Judge, concurring in part and dissenting in part.

In my view, the federal courts do not have jurisdiction of Equal Pay Act claims against a state. Therefore, I must dissent from the court's holding to the contrary. However, given that the court believes that we do have jurisdiction in this case, I concur in the holding that the district court was correct in granting summary judgment to the defendant on the merits of the issues involved.

In *Seminole Tribe v. Florida*, —— U.S. ——, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), the Supreme Court clearly held that states could not be called into federal court against their will under legislation passed pursuant to the Commerce Clause. While the Court noted that the question of the power of Congress to pass similar legislation under § 5 of the Fourteenth Amendment was not raised before it, it certainly did not endorse this court's view today that it was free to scour the Constitution looking for sources of power that Congress never invoked. Indeed, it seems to me that our examination of the sources of power for the statute directly contradicts the holding of *Pennhurst State*

*School and Hospital v. Halderman*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). That case held that "we should not quickly attribute to Congress an unstated intent to act under its authority to enforce the Fourteenth Amendment. Our previous cases are wholly consistent with that view, since Congress in those cases expressly articulated its intent to legislate pursuant to § 5." *Id.* at 16, 101 S.Ct. at 1539. Although three justices dissented on the merits of the case, the dissent specifically stated: "I agree that [this Act] was enacted pursuant to Congress' spending power and not pursuant to its power under § 5 of the Fourteenth Amendment.... Congressional action under the Enforcement Clause of the Fourteenth Amendment ... has very significant consequences, and ... it should not be lightly assumed that Congress acted pursuant to its power under § 5 in passing the Act." 451 U.S. at 35, 101 S.Ct. at 1549 (dissent) (citation omitted). Our court today holds directly to the contrary: not only can it be lightly assumed, it can always be assumed, that Congress acted under its Fourteenth Amendment power, if such action would be constitutional.

I have no quarrel with the court's reliance on *Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), for the proposition that Eleventh Amendment immunity can be abrogated where Congress acts under § 5 of the Fourteenth Amendment. This follows merely from the chronology and substance of these two amendments. The error in *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989) (plurality), now overruled by *Seminole Tribe*, was in rejecting the equally clear chronological implications of the fact that the Eleventh Amendment was ratified *after* the Commerce Clause. Let me even grant for the moment that the court is correct in relying on the dicta in footnote 18 of *EEOC v. Wyoming*, 460 U.S. 226, 243–44 n. 18, 103 S.Ct. 1054, 1064 n. 18, 75 L.Ed.2d 18 (1983), that Congress's failure to cite the Fourteenth Amendment's § 5 as the source of its power has no significance to the challenge we face in this case to our jurisdiction over an Equal Pay

Act claim against a state defendant.[1] Neither of these principles is sufficient to confer jurisdiction upon us in this case, however. Here, Congress expressly stated the constitutional power pursuant to which it sought to legislate. The court's holding is apparently that this exclusive invocation of only one source of power was not only unnecessary, but completely irrelevant. Thus, in addition to relying on *EEOC* to reject any requirement of a clear statement for reliance on § 5 of the Fourteenth Amendment (contrary to *Pennhurst*), the court goes beyond that to reject even the sensible rule of *following* a *contrary* clear statement.

I could agree with such a holding if I believed that Congress never has any regard for the constitutional source of its power when it enacts legislation—that it simply seeks to exert its power without respecting any limits. If that were the case, then any such statement of the source of power would always be mere surplusage and a court would be free to rummage through the Constitution to find some clause that the court thinks might support the exercise of power. Such seems to have been the approach of a plurality of the Supreme Court in *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), when it effectively noted in dicta that the affirmative action program at issue in that case "could" have been enacted pursuant to the Spending Clause, the Commerce Clause, § 5 of the Fourteenth Amendment, or an "amalgam" of all three. Such an approach has never been endorsed by any majority of the Supreme Court, however.

The court is not showing sufficient respect for a coordinate branch of government. Thus, this case involves not only the structural imperative of federalism, but the structural imperative of restraint in the exercise of constitutional power. The court exceeds the bounds of judicial restraint by not recognizing in the enactment of the Equal Pay Act an exercise of congressional restraint. Under *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), and *Cooper v. Aaron*, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958), the power of the courts to interpret the Constitution is supreme, but it has never been exclusive. Our colleagues in the political branches, both the legislative and the executive, frequently make heartfelt decisions based on the Constitution. To do so, they are required to interpret the Constitution. We should not ignore these interpretations by other officers who take the same oath we do under Article VI. Indeed, we should respect them. It is not inconceivable that Congress might view a certain enactment as appropriate in pursuit of one constitutionally permitted end, but not with respect to others. While this does have the slightly anomalous result that Congress could make an unconstitutional law constitutional by choosing to exercise a different power, that still remains a choice to be made by Congress. By taking Congress at its word initially, however, we leave that constitutional choice to Congress in the first instance and not to the courts.

Moreover, I cannot agree that the rule set forth in *Pennhurst*, that a clear statement is required for Congress to use its Fourteenth Amendment power, was superseded by *EEOC*. First, as the Court itself admits, *EEOC*'s footnote 18 was mere dicta. Second, *EEOC* does not state that *Pennhurst*'s clear statement rule was entirely invalid, only that it applied to statutory construction, not to the issue of the limits of Congress's powers. But that is exactly my point here. I do not propose holding that the Equal Pay Act's grant of authority to federal courts to entertain suits against states under its provisions was unconstitutional under the Eleventh Amendment. I only propose holding that because Congress did not say, or even imply,[2] that it was acting pursuant to the

1. Though, of course, this is contrary to *Pennhurst* and *EEOC* does not purport to overrule that case.

2. The court correctly states, at footnote 6, the key portions of the legislative history of the 1974 extension of the FLSA to the states. As the court notes, the policy issue facing Congress was whether the states should be held to the same standards as private employers in their relation with their employees. The items debated were primarily the minimum wage and overtime provisions. Under these circumstances, I find it difficult to attribute to Congress any intent to treat the equal pay provisions separately from the rest of the FLSA and, with regard to those provisions only, to switch sources of power in

Fourteenth Amendment, and in fact noted that it was acting pursuant to. the Commerce Clause in the original ·FLSA, *Seminole Tribe*'s holding that *only* § 5 of the Fourteenth Amendment can abrogate Eleventh Amendment immunity means that Congress *did not* (not "could not") grant the federal courts jurisdiction over Equal Pay Act claims against a state. The virtue of my approach is precisely that I avoid construing constitutional provisions. Third, I note that none of the cases the Supreme Court cited to support its creation of the clear statement rule in *Pennhurst* involved statutory construction even though *Pennhurst* itself did. Therefore, I conclude that the dicta in *EEOC* does not persuasively limit *Pennhurst*.

Given the major changes wrought by the Supreme Court in *Pennhurst* and in *Seminole Tribe*, the holding in *Marshall v. Owensboro–Daviess County* is not only no longer binding on us, but is clearly overruled by those cases. I therefore dissent from the portion of the opinion that holds that we have subject matter jurisdiction to hear this case.

mid-stream, especially with regard to a provision that drew little or no separate attention.