Lillian E. **BRYANT,** Lillian W. Bryant, Carl Briscoe, Gustavia Ellis, Pierre Hollingsworth, Michael F. Johnson, Elwood S. Davis, First Ward Civic Association, Third Ward Civic Association and West Side Protective Homeowners Association, Plaintiffs,

v.

NEW JERSEY DEPARTMENT OF TRANSPORTATION, State of New Jersey, South Jersey Transportation Authority, Mirage Resorts Incorporated, New Jersey Transportation Trust Fund Authority and Casino Reinvestment Development Authority, Defendants.

No. CIV. A. 97–1397.

United States District Court, D. New Jersey.

May 18, 1998.

Stanley C. Van Ness, Karen L. Cayci, Herbert, Van Ness, Cayci & Goodell, Princeton, NJ, for Plaintiffs.

Edward N. Fitzpatrick, Benjamin Clarke, William J. Bailey, DeCotiis, Fitzpatrick &

Gluck, Teaneck, NJ, for Defendant, Mirage Resorts, Inc.

Peter Verniero, Attorney General of New Jersey, Jeffrey J. Miller, Jerry Fischer, Assistant Attorneys General, Josh Lichtblau, Kevin Marc Schatz, Robert Marshall, Deputy Attorneys General, Trenton, NJ, for Defendants, State of New Jersey, New Jersey Department of Transportation and New Jersey Transportation Trust Fund Authority.

Thomas Edward Monahan, Jean L. Cipriani, Gilmore & Monahan, P.A., Toms River, NJ, for Defendant, South Jersey Transportation Authority.

Theodore W. Geiser, Patrick J. McAuley, Liza M. Walsh, Mark D. Haefner, Connell, Foley & Geiser, LLP, Roseland, NJ, for Defendant, Casino Reinvestment Development Authority.

Renee Steinhagen, Public Interest Law Center of New Jersey, An Appleseed Affiliate, Newark, NJ, for Amicus Curiae.

Bill Lann Lee, Acting Assistant Attorney General, Joan A. Magagna, Acting Chief, Housing and Civil Enforcement Section, Joseph D. Rich, Burtis M. Dougherty, Attorneys, Housing and Civil Enforcement Section, Civil Rights Division, United States Department of Justice, Washington, DC, Faith S. Hochberg, United States Attorney, Louis J. Bizzarri, Assistant United States Attorney, Camden, NJ, for Intervenor, United States.

## OPINION

ORLOFSKY, District Judge.

The plaintiffs filed this action to prevent the construction of a highway and tunnel through their neighborhood which will require the condemnation of several homes and will allegedly cause flooding, noise and traffic problems. The plaintiffs claim that this project will have a disparate impact on their predominantly African–American community in violation of United States Department of Transportation regulations promulgated pursuant to Title VI of the Civil Rights Act of 1964 which prohibits racial discrimination by entities receiving federal funds. This case has already given rise to several novel and complex legal issues and two published decisions.[1]

The State of New Jersey, the New Jersey Department of Transportation, the New Jersey Transportation Trust Fund Authority, the South Jersey Transportation Authority and the Casino Reinvestment and Development Authority have moved to dismiss this suit on the basis of Eleventh Amendment immunity or, in the alternative, have asked this Court to abstain from exercising federal jurisdiction over this controversy in favor of state eminent domain proceedings. Congress has expressly abrogated state sovereign immunity from suits filed under Title VI.[2] Therefore, the defendants' motion directly challenges the constitutionality of that abrogation provision. For the reasons set forth below, I conclude that the congressional abrogation of the states' Eleventh Amendment immunity under Title VI is constitutional, and that abstention is not warranted under the circumstances of this case. Consequently, the motion of these defendants will be denied.

## I. BACKGROUND

Lillian E. Bryant, Lillian W. Bryant, Carl Briscoe, Gustavia Ellis, Pierre Hollingsworth, Michael F. Johnson, Elwood S. Davis, the First Ward Civic Association, the Third Ward Civic Association and the West Side Protective Homeowners Association (collectively "Plaintiffs") filed this action against the State of New Jersey, the New Jersey Department of Transportation, the New Jersey Transportation Trust Fund Authority, the South Jersey Transportation Authority (collectively the "State Defendants"), the Casino Reinvestment Development Authority

1. See Bryant v. New Jersey Department of Transportation, 987 F.Supp. 343 (D.N.J.1998); Bryant v. New Jersey Department of Transportation, 998 F.Supp. 438 (D.N.J.1998).

2. Congress has provided: "A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of ... title VI of the Civil Rights Act of 1964." 42 U.S.C. § 2000d–7(a)(1).

("CRDA") and Mirage Resorts, Inc. ("Mirage"). The factual allegations contained in the Amended Complaint have been outlined in my first opinion in this case, and will not be repeated here. *See Bryant v. New Jersey Department of Transportation ("Bryant I"),* 987 F.Supp. 343, 345–46 (D.N.J.1998).

In *Bryant I,* I determined that the Department of Transportation's regulations implementing Title VI could support Plaintiffs' private cause of action for disparate impact discrimination. *See id.* at 348. Nevertheless, I dismissed the Amended Complaint for lack of standing under the "Simpson Doctrine" which required that Title VI plaintiffs be the intended beneficiaries of, participants in, or applicants for federal financial assistance. *See id.* at 352. In light of a Supreme Court opinion issued several days after I decided *Bryant I,* however, I reconsidered my decision and concluded that the so-called "intended beneficiary" doctrine was no longer a valid interpretation of the zone of interests protected by Title VI. *See Bryant v. New Jersey Department of Transportation ("Bryant II"),* 998 F.Supp. 438 (D.N.J.1998) (interpreting *National Credit Union Administration v. First National Bank & Trust Co.,* —— U.S. ——, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998)). Consequently, pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, I vacated my prior order dismissing Plaintiffs' Title VI claim and reinstated this action.

The reinstatement of Plaintiffs' claim now requires that I decide the dispositive motions which had originally been filed by the State Defendants, CRDA and Mirage prior to my decision in *Bryant I.* During a hearing on March 27, 1998, however, Mirage withdrew its motion to dismiss the Amended Complaint. *See* Transcript of Hearing before Hon. Stephen M. Orlofsky (dated Mar. 27, 1998) at 4, 21. At the same hearing, and with the consent of Plaintiffs, I dismissed Plaintiffs' claims against CRDA without prejudice because of the absence of any evidence that CRDA had played a role in deciding where to locate the highway and tunnel. *See id.* at 26. That rendered CRDA's motion for judgment on the pleadings moot, and left pending only the motion of the State Defendants to dismiss the Amended Complaint.[3]

As I explain below, the motion of the State Defendants to dismiss Plaintiffs' claim on Eleventh Amendment grounds directly calls into question the constitutionality of a congressional statute, 42 U.S.C. § 2000d–7, insofar as it abrogates state sovereign immunity under Title VI. Therefore, pursuant to 28 U.S.C. § 2403(a), I certified this issue to the Attorney General of the United States of America.[4] On April 15, 1998, I granted the motion of the United States to intervene in this case to allow the government to defend the constitutionality of § 2000d–7 against the State Defendants' Eleventh Amendment challenge.

## II. APPLICABLE LEGAL STANDARD

■ The State Defendants have moved to dismiss the Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Technically, this motion must be treated as a motion for judgment on the pleadings pursuant to Rule 12(c) because each of the State Defendants has answered the Amended Complaint. *See Turbe v. Virgin Islands,* 938 F.2d 427, 428 (3d Cir.1991); *Borough of Sayreville v. Union Carbide Corp.,* 923 F.Supp. 671, 675 (D.N.J.1996); *see also* Fed.R.Civ.P. 12(h)(2) ("A defense of failure to state a claim upon which relief can be granted ... may be made ... by motion for judgment on the pleadings."). A motion to dismiss for failure to state a claim, however, even when presented as a motion for judgment on the pleadings, should be evaluated

---

**3.** The South Jersey Transportation Authority is represented by separate counsel from the other State Defendants, but has joined in their motion. Therefore, I will treat all of the State Defendants collectively for purposes of this opinion.

**4.** That statute provides in relevant part: "In any action, suit or proceeding in a court of the United States to which the United States or any agency, officer or employee thereof is not a par-

ty, wherein the constitutionality of any Act of Congress affecting the public interest is drawn into question, the court shall certify such fact to the Attorney General, and shall permit the United States to intervene for presentation of evidence, if evidence is otherwise admissible in the case, and for argument on the question of constitutionality." 28 U.S.C. § 2403(a).

by the familiar standards of Rule 12(b)(6). *See Turbe*, 938 F.2d at 428; *Union Carbide*, 923 F.Supp. at 675.

That inquiry generally requires that I "accept as true the factual allegations in the amended complaint and all reasonable inferences that can be drawn from them, and to refrain from granting a dismissal unless it is certain that no relief can be granted under any set of facts which could be proved." *Fuentes v. South Hills Cardiology*, 946 F.2d 196, 201 (3d Cir.1991) (citing *Ransom v. Marrazzo*, 848 F.2d 398, 401 (3d Cir.1988)); *see Schuylkill Energy Resources, Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 412 (3d Cir.), *cert. denied*, — U.S. —, 118 S.Ct. 435, 139 L.Ed.2d 335 (1997). However, "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law." *Neitzke v. Williams*, 490 U.S. 319, 326–27, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989); *accord Mruz v. Caring, Inc.*, 991 F.Supp. 701, 706–07 (D.N.J. 1998).

## III. SOVEREIGN IMMUNITY

The Eleventh Amendment to the United States Constitution provides: "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Since *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), the Supreme Court has interpreted the Eleventh Amendment to bar claims in federal court against a state by its own citizens, thus applying the bar in both diversity and federal-question cases. *See,*

*e.g., Idaho v. Coeur d'Alene Tribe of Idaho*, — U.S. —, —, 117 S.Ct. 2028, 2033, 138 L.Ed.2d 438 (1997).[5]

■ Subject to the conditions described in *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), however, Congress may abrogate state sovereign immunity and thereby subject states to suit in federal court.[6] To determine whether Congress has properly abrogated the State Defendants' sovereign immunity, I must answer two questions: (1) has Congress "unequivocally express[ed] its intent to abrogate the immunity;" and (2) has Congress done so "pursuant to a valid exercise of power." *Seminole Tribe*, 517 U.S. at 55 (quoting *Green v. Mansour*, 474 U.S. 64, 68, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985)). I will address these questions in turn. *See Seminole Tribe*, 517 U.S. at 71 n. 15 ("both the doctrine requiring avoidance of constitutional questions, and principles of federalism, require us always to apply the clear statement rule before we consider the constitutional question whether Congress has the power to abrogate").

### A. Congressional Intent

■ In 1986, Congress passed the Rehabilitation Act Amendments of 1986, Pub.L. 99–506, 100 Stat. 1845, which provide in part:

*A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973, title IX of the Education Amendments of 1972, the Age*

---

**5.** Each of the State Defendants bears the burden of establishing its entitlement to sovereign immunity as "an 'alter ego' or 'arm' of a state for purposes of the Eleventh Amendment." *See Christy v. Pennsylvania Turnpike Commission*, 54 F.3d 1140, 1144 (3d Cir.1995) (setting forth a three-part test). None of the State Defendants, however, has provided such evidence in this case. Some of the State Defendants may not need to provide such evidence, *see Citizens' Committee for Environmental Protection v. United States Coast Guard*, 456 F.Supp. 101, 112 (D.N.J. 1978) ("The New Jersey Department of Transportation is clearly an alter ego of the State of New Jersey."), but that status is by no means automatic, *see, e.g., Fitchik v. New Jersey Transit Rail Operations, Inc.*, 873 F.2d 655 (3d Cir.1989)

(concluding that the New Jersey Transit Corporation was not an arm of New Jersey for Eleventh Amendment purposes). My conclusion in this case, however, obviates the need for me to address the merits of this issue.

**6.** Because I find that Congress has validly abrogated sovereign immunity under Title VI, I need not decide whether the other exceptions to sovereign immunity-waiver or the doctrine enunciated in *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)—apply here. *See Wheeling & Lake Erie Railway Co. v. Public Utility Commission of the Commonwealth of Pennsylvania*, 141 F.3d 88 at 94 n. 9 (3d Cir. 1998).

Discrimination Act of 1975, *title VI of the Civil Rights Act of 1964,* or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.

42 U.S.C. § 2000d–7(a)(1) (emphasis added). There can be no question that this expresses the clear and unequivocal intent of Congress to abrogate state sovereign immunity under Title VI. *See Lane v. Pena,* 518 U.S. 187, 197–98, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996); *Middlebrooks v. University of Maryland at College Park,* 980 F.Supp. 824, 827–28 (D.Md.1997).

## B. Congressional Authority

■ In *Seminole Tribe,* the Supreme Court held that Article I of the United States Constitution could not authorize Congress to abrogate Eleventh Amendment immunity because the Eleventh Amendment had been adopted after the ratification of Article I. The Fourteenth Amendment, however, unlike Article I, was adopted subsequent to the Eleventh Amendment and therefore "operated to alter the pre-existing balance between state and federal power achieved by Article III and the Eleventh Amendment." *See Seminole Tribe,* 517 at 65–66. Consequently, after *Seminole Tribe,* "the only remaining source of congressional power to abrogate states' Eleventh Amendment immunity is the Fourteenth Amendment." *Wheeling & Lake Erie Railway Co. v. Public Utility Commission of Pennsylvania,* 141 F.3d 88 at 92 (3d Cir. 1998); *accord College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board,* 131 F.3d 353, 358 (3d Cir. 1997).[7] The validity of Title VI's abrogation provision, therefore, depends upon whether § 2000d–7 was passed pursuant to the Fourteenth Amendment.[8]

In the wake of *Seminole Tribe,* courts have expressed some dismay at the lack of guidance provided in that decision as to the appropriate method for determining whether an abrogation provision was enacted under the authority of the Fourteenth Amendment. *See, e.g., Hurd v. Pittsburg State University,* 109 F.3d 1540, 1545 (10th Cir.1997) ("Although *Seminole Tribe* requires courts to ascertain that Congress exercised valid legislative authority, *Seminole Tribe* articulates no particular method for determining the source of that authority."); *Timmer v. Michigan Department of Commerce,* 104 F.3d 833, 841–42 (6th Cir.1997) ("*Seminole Tribe* says nothing about the situation presented here where there is a question about whether Congress legislated pursuant to an unstated Constitutional provision.").

During the pendency of this motion, however, the Third Circuit resolved two aspects of the *Seminole Tribe* analysis which, in combination, are dispositive of the Eleventh Amendment issue presented in this case. *See Wheeling,* 141 F.3d 88. First, the Third Circuit determined that an abrogation of sovereign immunity was valid under *Seminole Tribe* so long as the statute "could reasonably" have been authorized by the Fourteenth Amendment, regardless of whether Congress actually intended to invoke that authority. *See id.* at 92–93 (quoting *Fullilove v. Klutznick,* 448 U.S. 448, 477, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980)); *see also Franks v. Kentucky School for the Deaf,* 142 F.3d 360, 362–63 (6th Cir. 1998) ("The question is whether Congress actually had the authority to adopt the legislation pursuant to [the Fourteenth Amendment], not whether Congress correctly guessed the source of its authority."); *Crawford v. Davis,* 109 F.3d 1281, 1283 (8th Cir.1997) ("As long as Congress had such authority as an objective matter, whether it also had the specific intent to legislate pursuant to that authority is irrelevant."); *Doe v. University of Illinois,* 138 F.3d 653, 659 (7th Cir.1998) (following *Crawford* ); *In re Sacred Heart Hospital of Norristown,* 133 F.3d 237, 244 (3d Cir.1998) ("Congress need not recite the words 'section

---

7. Section 5 of the Fourteenth Amendment grants Congress "the power to enforce" the provisions of that amendment, including the Equal Protection Clause. *See* U.S. Const. amend. XIV, § 5.

8. Of course, the relevant statute for purposes of this analysis is § 2000d–7 and not Title VI itself. *See Timmer v. Michigan Department of Commerce,* 104 F.3d 833, 838 n. 7 (6th Cir.1997) (finding that the appropriate subject of the *Seminole Tribe* analysis for the Fair Labor Standards Act of 1963 was the 1974 amendment which purported to abrogate states' sovereign immunity).

5' or 'Fourteenth Amendment' or 'equal protection' when enacting laws pursuant to this power") (quotation omitted); *College Savings Bank*, 131 F.3d at 358 ("Congress is not required to discuss or explain explicitly the constitutional basis for laws that it enacts").

Second, the *Wheeling* court found that Congress could reasonably have legislated under the authority of the Fourteenth Amendment where it sought to remedy discrimination. *See Wheeling*, 141 F.3d 88 at 93–94 (finding that the immunity abrogation provision of the Railroad Revitalization and Regulatory Reform Act of 1976, 49 U.S.C. § 11501, was Fourteenth Amendment legislation under *Seminole Tribe* based upon "evidence in section 11501's legislative history and judicially-recognized anti-discrimination purpose"); *see also id.* (interpreting *Wilson–Jones v. Caviness*, 99 F.3d 203 (6th Cir.1996), *amended by* 107 F.3d 358 (6th Cir.1997), to permit courts to uphold such legislation where "Congress made findings that a particular group needed legal protection to remedy some sort of invidious discrimination not directly addressed by federal precedent").[9]

This approach reflects the Third Circuit's prior holding that, for a statute to abrogate state sovereign immunity in a constitutionally permissible manner, "there must be something about the act connecting it to recognized Fourteenth Amendment aims." *In re Sacred Heart Hospital*, 133 F.3d at 244. Preventing states from engaging in racial discrimination has, of course, long been recognized as a primary goal of the Fourteenth Amendment. *See, e.g., Ham v. South Carolina*, 409 U.S. 524, 526–27, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973) ("a principal purpose of the adoption of the Fourteenth Amendment was to prohibit the States from invidiously discriminating on the basis of race"); *Palmer v. Thompson*, 403 U.S. 217, 220, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971) ("There can be no doubt that a major purpose of this amendment was to safeguard Negroes against discriminatory state laws."); *Loving v. Virginia*, 388 U.S. 1, 10, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) ("The clear and central purpose of the Fourteenth Amendment was to eliminate all official state sources of invidious racial discrimination in the States.").

In the context of this case, § 2000d–7 permits suits against states to prevent them from discriminating on the basis of race, color or national origin. *See* 42 U.S.C. §§ 2000d–7, 2000d; *see also Bryant II*, 998 F.Supp. 438 at 445 ("Title VI has been interpreted to reflect two purposes: (1) to prevent discrimination by entities which receive federal funds; and (2) to provide citizens with effective protection against discrimination.") (quotation omitted). Thus, as the Sixth Circuit observed of an analogous immunity abrogation provision, I find that § 2000d–7 "is an anti-discrimination measure and as such ... it should be viewed as an exercise of Congress' power to adopt legislation enforcing the Fourteenth Amendment's guarantees of equal protection of the law." *See Timmer*, 104 F.3d at 833 n. 8 (applying *Seminole Tribe* to find that Congress validly abrogated state immunity under the Equal Pay Act of 1963); *Clark v. California*, 123 F.3d 1267, 1270 (9th Cir.) (finding that § 2000d–7 abrogated states' immunity from suit under § 504 of the Rehabilitation Act because "the disabled are protected against discrimination by the Equal Protection Clause" and the purpose of § 504 "is to prohibit discrimination against the disabled"), *cert. denied* —— U.S.

9. After the Third Circuit's March 31, 1998, decision in *Wheeling*, in a conference call with all counsel on April 7, 1998, and in a confirming letter of that date sent to all counsel by facsimile, I requested supplemental briefs on the impact, if any, of the *Wheeling* decision on the State Defendants' pending motion. In a letter to the Court, the State Defendants acknowledged the precariousness of their original position. They conceded that the *Wheeling* decision "permit[s] a court to inquire whether Congress could have enacted the statute in question pursuant to Section Five of the Fourteenth Amendment and to answer that question in the affirmative if the statute is designed to remedy discrimination." Letter from Assistant Attorney General Jeffrey J. Miller (dated Apr. 8, 1998) at 2. The State Defendants concluded that because "Title VI is designed to remedy discrimination, we believe that the Third Circuit would conclude that Congress could have enacted Title VI pursuant to Section Five of the Fourteenth Amendment and that, therefore, Congress[] validly abrogated the State's Eleventh Amendment immunity." *Id.* Nevertheless, to preserve this issue for appellate review, the State Defendants have refused to withdraw their motion.

——, 118 S.Ct. 2340, —— L.Ed.2d —— (1998).

This conclusion is supported by the legislative history of § 2000d–7 which reflects Congress' reliance, at least in part, on its authority under § 5 of the Fourteenth Amendment. *See* 131 Cong. Rec. 22,346 (noting that § 2000d–7 was "clearly authorized" by both the Spending Clause and the Fourteenth Amendment) (statement of Sen. Cranston); *Malooly v. Texas,* Civ. Action No. 96–229, slip op. at 6–7 (W.D.Tex. Nov. 12, 1996) (applying *Seminole Tribe* to find that § 2000d–7 abrogated state sovereign immunity under Title VI based in part on legislative history indicating that Congress acted pursuant to the Fourteenth Amendment); *see also* 132 Cong. Rec. 28,624 (noting that § 2000d–7 would clarify Congress' intent to abrogate state sovereign immunity "to the extent that the proposed amendment is grounded on congressional powers under section five of the fourteenth amendment") (quoting letter from the Department of Justice).

The conclusion that § 2000d–7 was authorized by the Fourteenth Amendment is also consistent with published decisions of other federal courts. Prior to the Supreme Court's decision in *Seminole Tribe,* Judge Kearse of the Second Circuit found that § 2000d–7 abrogated state immunity under Title VI pursuant to § 5 of the Fourteenth Amendment. *See United States v. Yonkers Board of Education,* 893 F.2d 498, 503 (2d Cir.1990); *cf. United Steelworkers of America v. Weber,* 443 U.S. 193, 206 n. 6, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979) (contrasting Title VI with Title VII based upon the fact that Title VII "was not intended to incorporate and particularize the commands of the Fifth and Fourteenth Amendments"). Several courts have also reached that conclusion in the context of § 2000d–7's abrogation of state immunity from suits under Title VI's legislative cousins, § 504 of the Rehabilitation Act of 1973 which prohibits discrimination on the basis of physical handicap and Title IX of the Civil Rights Act of 1964 which prohibits discrimination on the basis of gender. *See, e.g., University of Illinois,* 138 F.3d 653; *Clark,* 123 F.3d 1267; *Crawford,* 109 F.3d at 1283.

Several other decisions, rendered after *Seminole Tribe* but not explicitly applying that analysis, have noted that § 2000d–7 abrogates immunity from suits under Title VI. *See, e.g., DeKalb County School District v. Schrenko,* 109 F.3d 680, 688 (11th Cir.) (noting that, based upon § 2000d–7, "the State could be forced to defend a Title VI action in federal court without its consent"), *cert. denied,* —— U.S. ——, 118 S.Ct. 601, 139 L.Ed.2d 489 (1997); *Seater v. California State University, Fullerton,* 48 F.3d 1228 (9th Cir.1995) (table, text at 1995 WL 72356) (reversing dismissal of Title VI claims against state because § 2000d–7 abrogated state immunity); *De Jesus–Keolamphu v. Village of Pelham Manor,* 999 F.Supp. 556, 563 (S.D.N.Y.1998); *Middlebrooks,* 980 F.Supp. at 827; *Quiroz v. State Board of Education,* 1997 WL 661163, *2 (E.D.Cal. Sep.10, 1997).

■ The State Defendants rely upon the Supreme Court's decision in *Guardians Association v. Civil Service Commission,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983), which interpreted Title VI in light of the Court's finding that Title VI was enacted pursuant to the Spending Clause of Article I. Although I cannot disregard that finding, it is not inconsistent with my conclusion that § 2000d–7 represents a constitutional exercise of legislative authority. As the Seventh Circuit has observed, "there is nothing odd in the proposition that Congress may have acted pursuant to more than one of its sources of power in enacting a single piece of legislation." *See University of Illinois,* 138 F.3d at 659 (finding it reasonable that "Congress, in using federal educational funds as the core of Title IX, should use its Spending Clause powers to reach private actors and its Fourteenth Amendment powers to reach the states"); *see also Griffin v. Breckenridge,* 403 U.S. 88, 107, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971) (upholding constitutionality of the Ku Klux Klan Act under both the Thirteenth Amendment and the constitutional power to protect the right of interstate travel and noting that, "[i]n identifying these two constitutional sources of congressional power, we do not imply the absence of any other"); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144,

187, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) ("powers exercised by Congress may stem from more than one constitutional source") (Douglas, J., dissenting). Therefore, the notion that Title VI was passed pursuant to the Spending Clause is not at all inconsistent with my finding that it was authorized by § 5 of the Fourteenth Amendment.[10]

Moreover, as a mere exercise in statutory interpretation, the Supreme Court's finding in *Guardians* that Title VI is Spending Clause legislation is not dispositive in the present context of evaluating a statute's constitutionality. *See Equal Employment Opportunity Commission v. Wyoming*, 460 U.S. 226, 242 n. 18, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983) (finding that a prior determination that a statute was not enacted pursuant to the Fourteenth Amendment did not preclude upholding its constitutionality on that ground where the Court's only initial task "was to construe a statute, not to adjudge its constitutional validity") (citation omitted); *University of Illinois*, 138 F.3d at 658 (finding that determination "involving statutory construction, rather than congressional authority to legislate" was "inapposite to the inquiry into a statute's constitutional grounding in Section 5 [of the Fourteenth Amendment]").

For these reasons, I conclude that Congress could have enacted § 2000d–7 pursuant to its authority under the Fourteenth Amendment. Therefore, within the analytical framework of *Seminole Tribe* as refined by the Third Circuit's recent decision in *Wheeling*, I hold that the congressional abrogation of state sovereign immunity from suits brought under Title VI is constitutional. Accordingly, the State Defendants' motion for judgment on the pleadings based upon the Eleventh Amendment will be denied.

## IV. ABSTENTION

The State Defendants have also invoked the doctrine of abstention, contending that this Court should abstain from hearing this case so that the parties may litigate these issues in state eminent domain proceedings. The Third Circuit has taken pains to emphasize the generally limited nature of abstention:

> because Congress, and not the judiciary, determines the scope of federal jurisdiction within constitutionally permissible bounds, a federal court has no authority to abstain from the exercise of jurisdiction that has been properly conferred. This obligation to adjudicate claims within the federal courts' jurisdiction is virtually unflagging. However, because federal courts do have discretion in determining whether to grant certain types of relief, abstention is appropriate in a few carefully defined situations. But abstention remains the exception, not the rule. The doctrine of abstention . . . is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. . . . Therefore, [a]bstention rarely should be invoked.

*Gwynedd Properties, Inc. v. Lower Gwynedd Township*, 970 F.2d 1195, 1199 (3d Cir.1992) (quotations and citations omitted).

■ Nevertheless, as a general matter, "it is clear that abstention can apply to eminent domain cases." *Edwards v. Arkansas Power & Light Co.*, 683 F.2d 1149, 1156 (8th Cir. 1982). That principle is widely credited to the Seventh Circuit's determination that "the mere existence of a federal constitutional attack on an eminent domain proceeding of the state should not be grounds for a district court's decision not to abstain" because "such a factor would nearly always preclude abstention in this type of case." *Ahrensfeld v. Stephens*, 528 F.2d 193 (7th Cir.1975). Courts within this circuit have recognized this general principle. *See, e.g., Kessler Institute for Rehabilitation, Inc. v. Mayor and Council of Borough of Essex Fells*, 876 F.Supp. 641, 658–60 (D.N.J.1995) (abstaining from claims that state was condemning property in violation of federal anti-discrimination laws);[11] *see also Brown v. Francis*, 75 F.3d

10. Of course, if it were not authorized by the Fourteenth Amendment, § 2000d–7 would be an unconstitutional exercise of legislative power. As the Third Circuit recently noted, "congressional enactments are accorded a 'presumption of validity.'" *See College Savings Bank*, 131 F.3d at 358 (quoting *City of Boerne v. Flores*, —— U.S.

——, ——, 117 S.Ct. 2157, 2172, 138 L.Ed.2d 624 (1997)).

11. In *Kessler*, Judge Bassler abstained on the basis of *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), because of a

860, 867 (3d Cir.1996) (suggesting that the district court, on remand, should consider abstaining from inverse condemnation proceeding while local court heard condemnation action).

Despite the possibility of abstention, however, the Third Circuit has "admonished district courts not to dismiss claims hastily merely because they may involve land use issues." *See Gwynedd Properties,* 970 F.2d at 1203 (citing *Heritage Farms, Inc. v. Solebury Township,* 671 F.2d 743 (3d Cir.), *cert. denied,* 456 U.S. 990, 102 S.Ct. 2270, 73 L.Ed.2d 1285 (1982)); *see also Fountain v. Metropolitan Atlanta Rapid Transit Authority,* 678 F.2d 1038, 1046 (11th Cir.1982) ("[T]he federal courts should not abstain merely because local condemnation is involved. Only in those instances in which other exceptional circumstances exist should the federal court abstain once its jurisdiction is properly invoked."), *cited with approval in Brown,* 75 F.3d at 867. With these general principles in mind, I turn now to the specific abstention doctrines upon which the State Defendants rely.

### A. Colorado River Abstention

The State Defendants contend that abstention is warranted in this case under the doctrine established in *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), which permits a district court, in exceptional circumstances, "to dismiss a federal action because of parallel state-court litigation." *See Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 16, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). It is well settled that the federal judiciary is generally obligated to exercise its jurisdiction, and that the mere "pendency of an action in state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction." *Ryan v. Johnson,* 115 F.3d 193, 195 (3d Cir.1997) (quoting *Colorado River,* 424 U.S. at 817).

pending state court proceeding which implicated important state interests and which provided adequate opportunity to raise constitutional challenges. *See Kessler,* 876 F.Supp. at 658.

Nevertheless, "there are certain extremely limited circumstances in which a federal court may defer to pending state court proceedings based on considerations of 'wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.'" *Ryan,* 115 F.3d at 195–96 (quoting *Colorado River,* 424 U.S. at 817); *see Michelson v. Citicorp National Services, Inc.,* 138 F.3d 508, 513 (3rd Cir.1998). The Supreme Court has emphasized, however, that "[a]bdication of the obligation to decide cases can be justified … only in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest." *Colorado River,* 424 U.S. at 813.

■ Unlike traditional abstention grounds "which rest on considerations of proper constitutional adjudication or federal-state relations," *Colorado River* abstention "is aimed at avoiding duplicative litigation and is premised on considerations which concern the efficient administration of judicial resources and the comprehensive disposition of cases." *NYLife Distributors, Inc. v. Adherence Group, Inc.,* 72 F.3d 371, 376 (3d Cir.1995), *cert. denied,* 517 U.S. 1209, 116 S.Ct. 1826, 134 L.Ed.2d 931 (1996); *see Trent v. Dial Medical of Florida, Inc.,* 33 F.3d 217, 223 (3d Cir.1994). Although any form of abstention is the exception rather than the rule, "*Colorado River* abstention is even rarer." *Id.* at 223.

The Third Circuit has described the exceptional circumstances which may justify abstention pursuant to the *Colorado River* doctrine:

In order for *Colorado River* abstention to be appropriate, there must be parallel state and federal litigations that are truly duplicative. When the two cases fit this requirement, the district court, in its discretion, may abstain only if the several *Colorado River* factors clearly weigh in favor of abstention because the federal courts have a virtually unflagging obli-

Here, however, the State Defendants have not sought *Younger* abstention. Moreover, as discussed below, there is no pending state action in this case as required for *Younger* abstention.

gation ... to exercise the jurisdiction given them.

*Rycoline Products, Inc. v. C & W Unlimited,* 109 F.3d 883, 890 (3d Cir.1997) (citations and quotations omitted).

■■■■ The existence of a parallel state court action is a "threshold issue" which "must be decided in any *Colorado River* abstention case" because, if no parallel state court action exists, "the district court lacks the power to abstain." *Ryan,* 115 F.3d at 196; *see Trent,* 33 F.3d at 223 ("Cases that are not truly duplicative do not invite *Colorado River* deference."). In this case, however, I conclude that no parallel action exists. New Jersey's Eminent Domain Act of 1971 (the "Act"), N.J.S.A. 20:3–1 *et seq.,* in a section entitled "Commencement of action," provides that a condemnation action "shall be instituted by filing of a verified complaint." *See* N.J.S.A. 20:3–8. The State Defendants acknowledge that no such complaint has been filed but contend that, "[b]y virtue of the State's issuance of a condemnation notice to the affected property owners, the state court proceeding has been initiated." *See* State Defendants' Brief at 10.

The notice of condemnation, however, did not initiate any state court action, much less a parallel one. That notice is part of a *pre-litigation* administrative process, required by the Act as a condition precedent to commencement of a condemnation action. *See* N.J.S.A. 20:3–6 ("no action to condemn shall be instituted unless the condemnor is unable to acquire such title or possession through bona fide negotiations with the prospective condemnee, which negotiations shall include an offer in writing by the condemnor to the prospective condemnee"); *see also State by Commissioner of Transportation v. Carroll,* 123 N.J. 308, 316, 587 A.2d 260 (1991) (observing that where the state fails to comply with the requirements of N.J.S.A. 20:3–6, "the condemnation complaint will be dismissed"); *see generally* N.J. R. Ct. 4:73 (governing condemnation actions).

In *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984), the Supreme Court affirmed the denial of *Younger* abstention in an eminent domain case because there was no pending state action. In that case, a state statute required public hearings as part of the pre-litigation condemnation process. The Court found that, even though public hearings had been held as required by statute, "state judicial proceedings had not been initiated at the time proceedings of substance took place in federal court." *Id.* at 238. Because pre-litigation administrative procedures are insufficient to support federal abstention, the filing of the condemnation notice in this case did not initiate a state action. Consequently, I find that there is no parallel state action and that abstention pursuant to *Colorado River* is thereby precluded.

■■■■ Moreover, even if the condemnation notice could be viewed as instituting a state action, it would not be a "parallel" state action. "Generally, cases are parallel so as to justify abstention under *Colorado River* when they involve the same parties and claims." *Trent,* 33 F.3d at 223. The record does not contain the notice of condemnation, or a description of its contents. It would appear from the Act, however, that such a notice would state only the intent to condemn certain properties. The notice does not even permit an analysis of the parties and claims involved, much less permit a conclusion that the parties and claims are the same is in the federal action. Therefore, the State Defendants cannot, and have not, met their burden on this motion.

This result is unchanged by the State Defendants' reliance on *Township of West Windsor v. Nierenberg,* 150 N.J. 111, 695 A.2d 1344 (1997). In that case, the New Jersey Supreme Court found that the condemned property should be valued as of the date of the state's condemnation notice because, pursuant to N.J.S.A. 20:3–30(c), that notice "substantially affect[ed] the use and enjoyment of the property by the condemnee." *See id.* at 115, 695 A.2d 1344. The State Defendants would have me conclude that the fact that the timing of a notice of condemnation determines the valuation date logically implies that such notice initiates litigation. I decline the invitation to leap across that logical chasm. I can discern nothing in *Nierenberg* which overcomes the fact that, under New Jersey law and Su-

preme Court precedent, the notice precedes a court action.

Moreover, *Nierenberg* itself implies that the notice of condemnation does not initiate such an action. In concluding that the date of the condemnation notice set the date of valuation, the court specifically warned:

> That determination should not discourage municipalities from responsibly notifying potential condemnees of an intention to condemn. See N.J.S.A. 20:3–6 (dictating that condemnor must engage in bona fide negotiations that include written offer to purchase *before initiating condemnation proceedings* ).

*Nierenberg,* 150 N.J. at 137, 695 A.2d 1344 (emphasis added). This indicates that, despite deriving the valuation date from the issuance of a condemnation notice, the court nevertheless contemplated that the notice precedes a condemnation action rather than initiates one.

■ For these reasons, I conclude that no parallel state action exists in favor of which I might abstain from entertaining the present action.[12] Therefore, the State Defendants' motion to abstain pursuant to *Colorado River* will be denied.

## B. Burford Abstention

■ As an alternative basis for abstention, the State Defendants rely on *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). Circuit Judge, now Chief Judge, Becker of the Third Circuit set forth the prevailing standard for *Burford* abstention in this Circuit:

> *Burford* stands for the proposition that where a state creates a complex regulatory scheme, supervised by the state courts and central to state interests, abstention will be appropriate if federal jurisdiction deals primarily with state law issues and will disrupt a state's efforts to establish a coher-

ent policy with respect to a matter of substantial public concern.

*Lac D'Amiante du Quebec, Ltee v. American Home Assurance Co.,* 864 F.2d 1033, 1043 (3d Cir.1988) (quotation omitted). Thus, in general, "federal courts should exercise equitable discretion and refrain from exercising authority over questions involving basic problems of state policy pertaining to the regulation of important state natural resources." *Grode v. Mutual Fire, Marine & Inland Insurance Co.,* 8 F.3d 953, 956 (3d Cir.1993); *see also Trent,* 33 F.3d at 223 n. 5.

■ In keeping with the limited nature of federal abstention, the trend has been to minimize application of the *Burford* doctrine. *See Chiropractic Alliance of New Jersey v. Parisi,* 854 F.Supp. 299, 303 (D.N.J.1994). "While *Burford* is concerned with protecting complex state administrative processes from undue federal influence, it does not require abstention whenever there exists such a process, or even in all cases where there is a potential for conflict with state regulatory law or policy." *Quackenbush v. Allstate Insurance Co.,* 517 U.S. 706, 726–27, 116 S.Ct. 1712, 1726, 135 L.Ed.2d 1 (1996) (quoting *New Orleans Public Service, Inc. v. Council of City of New Orleans ("NOPSI"),* 491 U.S. 350, 362, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989)) (internal quotation omitted).

■ First, the exercise of federal jurisdiction in this case does not "deal primarily with state law issues." *See Lac D'Amiante,* 864 F.2d at 1043. Plaintiffs' sole remaining claim alleges a violation of Title VI's implementing regulations, and the legal issues implicated by that claim involve interpreting federal anti-discrimination law, not state law. *See, e.g., Bryant II,* 998 F.Supp. 438 (interpreting the zone of interests protected by Title VI in light of novel United States Supreme Court decision); *Bryant I,* 987 F.Supp. at 347–48 (finding no private right of action under Title VI, but finding a private right of action under the Department of

---

12. Even if there were a parallel state court proceeding, however, I would not abstain in this case. *Colorado River* abstention also requires me to weigh several factors: (1) which court first assumed jurisdiction over the res; (2) whether the federal court is inconvenient; (3) whether abstention would aid in avoiding piecemeal litigation; (4) which court obtained jurisdiction first; (5) whether state or federal law applies; and (6) whether the state proceedings will sufficiently protect the rights of the federal plaintiffs. *See Rycoline Products,* 109 F.3d at 890. On balance, these factors weigh in favor of exercising federal jurisdiction in this case.

Transportation's implementing regulations). Thus, far from dealing primarily with state law issues, this case is quintessentially federal.

Second, the exercise of federal jurisdiction in this case will not impose any "undue federal interference" on "complex state administrative processes." *See NOPSI*, 491 U.S. at 362. The State Defendants contend that the mere existence in New Jersey of eminent domain procedures warrants abstention in this case. The thrust of the federal action, however, does not overlap with the complexities of the state regulatory scheme which might deserve such protection from federal interference. *Burford* required abstention "[w]here the State had established its own elaborate review system for dealing with the geological complexities of oil and gas fields." *Colorado River*, 424 U.S. at 814–15. The only similar aspect of New Jersey's eminent domain scheme involves valuation of condemned properties. *See, e.g.*, N.J.S.A. 20:3–12 (providing for the appointment of three commissioners to determine compensation following limited discovery). This Court's review of whether Defendants have selected the project's site in a racially discriminatory manner, however, poses no threat of disruption to the state's valuation procedures. *Cf. Grode*, 8 F.3d at 956 ("*Burford* abstention is usually applied to state regulatory matters such as ... *applying* state eminent domain procedures.") (emphasis added).

Because this case deals with issues on the outskirts of complex state regulatory processes rather than interfering with them directly, I conclude that *Burford* abstention is not warranted. Accordingly, the State Defendants' motion to abstain under *Burford* will be denied.

## V. CONCLUSION

For the reasons set forth above, the State Defendants' motion for judgment on the pleadings, or to abstain will be denied. The Court will enter an appropriate Order.

### ORDER

This matter having come before the Court on the motion of Defendants, State of New Jersey, New Jersey Department of Transportation, New Jersey Transportation Trust Fund Authority, South Jersey Transportation Department, Casino Reinvestment Development Authority and Mirage Resorts, Inc., for judgment on the pleadings, or to abstain; and,

Stanley C. Van Ness, Esq., and Karen L. Cayci, Esq., Herbert, Van Ness, Cayci & Goodell, appearing on behalf of Plaintiffs, Lillian E. Bryant, Lillian W. Bryant, Carl Briscoe, Gustavia Ellis, Pierre Hollingsworth, Michael F. Johnson, Elwood S. Davis, First Ward Civic Association, Third Ward Civic Association and West Side Protective Homeowners Association; and,

Edward N. Fitzpatrick, Esq., Benjamin Clarke, Esq., and William J. Bailey, Esq., DeCotiis, Fitzpatrick & Gluck, appearing on behalf of Defendant, Mirage Resorts, Inc.; and,

Peter Verniero, Esq., Attorney General of New Jersey, Jeffrey J. Miller, Esq., and Jerry Fischer, Esq., Assistant Attorneys General, and Josh Lichtblau, Esq., Kevin M. Schatz, Esq., and Robert Marshall, Esq., Deputy Attorneys General, appearing on behalf of Defendants, State of New Jersey, New Jersey Department of Transportation and New Jersey Transportation Trust Fund Authority; and,

Thomas E. Monahan, Esq., Jean L. Cipriani, Esq. and Guy P. Ryan, Esq., Gilmore & Monahan, P.A., appearing on behalf of Defendant, South Jersey Transportation Authority; and,

Theodore W. Geiser, Esq., Patrick J. McAuley, Esq., Liza M. Walsh, Esq., and Mark D. Haefner, Esq., Connell, Foley & Geiser, LLP, appearing on behalf of Defendant, Casino Reinvestment Development Authority; and,

Renee Steinhagen, Esq., Public Interest Law Center of New Jersey, appearing as *amicus curiae;* and,

Bill Lann Lee, Esq., Acting Assistant Attorney General, Civil Rights Division of the Department of Justice, Joan A. Magagna, Esq., Acting Chief, Housing and Civil Enforcement Section, Joseph D. Rich, Esq., and Burtis M. Dougherty, Esq., Attorneys, Hous-

440

ing and Civil Enforcement Section, Faith S. Hochberg, Esq., United States Attorney for the District of New Jersey, and Louis J. Bizzarri, Esq., Assistant United States Attorney, appearing on behalf of Intervenor, the United States of America; and,

The Court having considered the submissions of the parties, *amicus curiae* and Intervenor, for the reasons set forth in the Court's OPINION, filed concurrently with this ORDER;

IT IS, on this 18th day of May, 1998, hereby ORDERED that the motion of Mirage Resorts, Inc., for judgment on the pleadings is WITHDRAWN; and,

IT IS FURTHER ORDERED that the Amended Complaint is DISMISSED WITHOUT PREJUDICE as to the Casino Reinvestment Development Authority; and,

IT IS FURTHER ORDERED that the motion of the State of New Jersey, the New Jersey Department of Transportation, the New Jersey Transportation Trust Fund Authority and the South Jersey Transportation Authority for judgment on the pleadings, or to abstain, is DENIED.